UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOSEPH ARENA, on behalf of himself and all
others similarly situated,

                     Plaintiffs,

        -against-

DELUX TRANSPORTATION SERVICES,
INC., and PETER BLASUCCI, an individual,

                     Defendants.
-----------------------------------------------------------------X

**CORRECTED**

**ECF CASE**

Docket No.: 12-CV-01718 (LDW)(ARL)

# DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Theodore L. Hecht
SCHNADER HARRISON SEGAL & LEWIS LLP
140 Broadway, Suite 3100
New York, New York 10005-1101
Telephone: (212) 973-8000
Facsimile: (212) 972-8798
Email: thecht@schnader.com

*Attorneys for Defendants -*
*Delux Transportation Services, Inc. and*
*Peter Blasucci*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

POINT I      THE COURT SHOULD DISMISS THE COMPLAINT ........................................ 2

POINT II      ARENA RELIES ON THE SAME DOCUMENTS THAT DELUX ASSERTS ARE INTEGRAL TO THE COMPLAINT ........................................... 4

POINT III      THE COURT SHOULD NOT CONSIDER ARENA'S PROFFERED EXTRINSIC DECLARATIONS AND DOCUMENTS .................. 5

POINT IV      ALTERNATIVELY, THE COURT SHOULD CONVERT THE MOTION TO ONE FOR SUMMARY JUDGMENT ............................................ 6

CONCLUSION ............................................................................................................................ 8

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Fonte v. Bd. of Managers of Cont'l Towers Condo,*
   848 F.2d 24 (2d Cir. 1988) ..................................................................................................6

*Kittay v. Kornstein,*
   230 F.3d 531 (2d Cir. 2000) .................................................................................................4

*Madu, Edozie & Madu P.C. v. SocketsWorks Ltd. Nigeria,*
   262 F.R.D. 106 (S.D.N.Y. 2010) ..........................................................................................6

*Malmsteen v. Universal Music Group, Inc.,*
   10 Civ. 3955 (PAE), 2012 WL 2159281 (June 14, 2012) (copy attached) ...........................6

*Ricciuti v. New York City Transit Auth.,*
   941 F.2d 119 (2d Cir. 1991) .................................................................................................4

*Velu v. Velocity Express, Inc.,*
   666 F.Supp.2d 300 (E.D.N.Y. 2009) ....................................................................................7

*Zhong v. August August Corp.,*
   498 F.Supp.2d 625 (S.D.N.Y. 2007) ................................................................................3, 4

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Fair Labor Standards Act, § 206(a)(1) ...........................................................................................3, 4, 7

Fed.R.Civ.P., Rule 8(a) ..........................................................................................................................4

Fed.R.Civ.P., Rule 12(b)(6) ...............................................................................................................1, 4

Fed.R.Civ.P., Rule 12(d) .......................................................................................................................6

Fed.R.Civ.P., Rule 56 ....................................................................................................................1, 2, 6

## PRELIMINARY STATEMENT

Defendants Delux Transportation Services, Inc. and Peter Blasucci ("Delux") submit this memorandum in reply to the opposition of plaintiff Joseph Arena ("Arena") to Delux's motion for an order (1) dismissing the Complaint, pursuant to Rule 12(b)(6), Fed.R.Civ.P., or (2) alternatively, converting Delux's motion to one for summary judgment, pursuant to Rules 12(d) and 56, Fed.R.Civ.P., and thereafter allowing submission of additional evidentiary materials as appropriate to a motion for summary judgment.

Arena's opposition does not overcome his Complaint's failure to allege facts supporting his regular and overtime wage claims. Arena improperly attempts to overcome his Complaint's deficiencies by submitting his own declaration and a declaration from his counsel which assert allegations not found within the Complaint and proffer documents not referenced in the Complaint.

Arena, however, proffers in his opposition, and relies upon, additional documents that are identical, or otherwise reference, the Taxicab Lease and Arena's reports that Delux submitted in its moving papers because they are intricate to Arena's allegations in the Complaint and relied upon by Arena. Arena thus validates Delux's argument that this Court may properly consider these documents when determining Delux's Rule 12(b)(6) motion.

Alternatively, the Complaint herein should be converted to one for summary judgment because, *inter alia*, Arena cannot raise a genuine triable issue of fact with respect to a critical element of his alleged wage claims, *to wit*: that he worked 72 hours per week, six days per week. Indeed, the very business records of the type relied upon by Arena in his opposition conclusively refute the allegations of his Complaint. No further discovery is needed with respect to this dispositive issue.

Additionally, Arena proffers extrinsic evidence which, as a matter of law, shows that he is an independent contractor and not an employee of Delux. Thus, the issue is ripe for summary judgment. Therefore, alternatively, the Court should notify the parties that the motion is converted to a motion for summary judgment, allow Delux to submit evidentiary declarations and exhibits and a Rule 56.1 statement, and thereupon grant Delux summary judgment dismissing the Complaint.

## POINT I

## THE COURT SHOULD DISMISS THE COMPLAINT

In his opposition, Arena argues that he has sufficiently alleged plausible claims by alleging that he "was required to work six days per week, seventy two hours per week, and twelve hours per day earning approximately $150 per week after splitting fares with the Defendants." Arena Memorandum of Law in Opposition dated October 1, 2012 (Arena Memorandum) at 3. Arena's argument fails to overcome the Complaint's insufficiency.

Arena's argument, like his Complaint, is entirely conclusory. Arena fails to allege any facts to support the conclusory allegation that he earned "$150 per week after splitting fares with Defendants." Arena fails to allege any facts showing how the approximate $150 per week is calculated. Arena fails to allege any facts showing his rate of pay, the amount of fares he collected and how the fares were split. Indeed, Arena alleges that he was "not paid any rate for hours worked" (Complaint ¶ 13), and fails to allege any facts explaining the basis upon which he was paid.

Although not addressed in his opposition, Arena also alleges in his Complaint that taxes were withheld without identifying the taxes or the amount of withholding, that he paid kickbacks to Delux without alleging a single fact to support the allegation, and that he suffered threats of retaliation without alleging any supporting fact.

In this regard, Arena's reliance on *Zhong v. August August Corp.*, 498 F.Supp.2d 625 (S.D.N.Y. 2007) is misplaced and, indeed, *Zhong* supports dismissal of Arena's Complaint. In *Zhong*, the plaintiff alleged in his Complaint "that he was paid a daily salary of $10.00 during his employment, and that he worked for either three or four hours per day, Monday through Saturday." *Zhong*, 498 F.Supp. at 629. The *Zhong* court held that, "while a claim under the FLSA to recover minimum or overtime wages should indicate the rate of pay and the amount of unpaid minimum or overtime wages due, the earnings [the plaintiff] alleges he is owed can readily be determined from his statements concerning his pertinent salary and working hours." *Id.*

Arena, however, fails to allege a daily or weekly salary, but alleges without facts that he earned $150 per week after splitting fares, kickbacks and withholding taxes. The Complaint fails to provide a factual basis to determine how his alleged earnings are calculated. Indeed, Arena alleges that he was "not paid any rate" (*See* Complaint at ¶ 16) without any factual allegation showing what this actually means. Arena further alleges that other plaintiffs, over a six year period prior to his involvement with Delux, were paid the identical $150 per week, but fails to allege any facts to support this conclusion.

Arena further misapplies *Zhong* when he argues that "the complaint [herein] need not specify the exact unpaid regular hours and overtime hours, rather only an approximate number is required." Arena Memorandum at 3. The *Zhong* court found that

> Zhong has indicated that he worked for twenty hours per week, spread out over six days per week, at a wage of $10.00 per day, for a total of (roughly) twenty weeks . . . Accordingly, the Court can conclude that Zhong has alleged that he was paid $1,200 for the duration of his employment. During the year that Zhong was employed, the FLSA § 206(a)(1) required that employees receive "not less than $5.15 an hour." Since Zhong is claiming that to have worked a total of 400 hours, he should have received a total

3

of $2,060.00. Thus, his pleadings are sufficient to inform [the defendant] that the damages claimed for the § 206 violation are the difference between these two figures.

*Zhong* at 629-30.

In the instant case, there is no way for Delux to determine from Arena's allegations how much he is claiming that he is owed, the wage rate he is alleging or the basis for his conclusion that he earned $150 per week. As noted, Arena alleges that he was not paid any wage rate, does not allege the total hours he worked, alleges that splits, deductions and kickbacks applied, but provides no factual basis for any of these conclusory allegations.

Contrary to Arena's argument, his Complaint fails to comply with Rule 8(a), Fed.R.Civ.P. because the Complaint fails to "disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and whether there is a legal basis for recovery'." *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (*quoting Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). The Court should dismiss the Complaint.

## POINT II

### ARENA RELIES ON THE SAME DOCUMENTS THAT DELUX ASSERTS ARE INTEGRAL TO THE COMPLAINT

As explained by Delux in its Moving Memorandum of Law and in Point I above, this Court should dismiss Arena's Complaint because Arena fails to allege facts sufficient to support any plausible claim. The Court thus need not consider the documents submitted by Delux in order to grant its motion pursuant to Rule 12(b)(6), Fed.R.Civ.P.

Alternatively, the documents submitted by Delux are integral to Arena's Complaint and provides an additional basis to find Arena's claims to be facially implausible. In opposition,

Arena argues that he did not rely on the Taxicab Lease or his reconciliation reports when formulating his Complaint, they are not integral to the Complaint and should not be considered by the Court as requested by Delux. Yet, in support of his opposition, Arena relies upon documents which specifically reference the Taxicab Lease and relies upon the same reconciliation reports that he prepared and a similar computerized version of his reports prepared by Delux. *See* Declaration of David H. Rosenberg dated October 1, 2012 ("Rosenberg Declaration") at Exhibit 4.

The documents upon which Arena relies conclusively show that he did not pay Delux kickbacks, the parties carefully accounted for in writing the payments between them, there is no fare splitting, Arena keeps his cash fares and tips, makes no accounting to Delux for such cash receipts and tips and is credited with 100% of the fares passengers charge. *Id.*

Delux has submitted the Taxicab Lease and the reconciliation reports because the Taxicab Lease forms the business relationship between the parties alleged in the Complaint and Arena's reports show the number of days per week he drove a taxicab. For this reason, Delux asserts that the documents are integrally related to the Complaint's allegations. While Arena now denies that he relied on the documents when formulating his Complaint, his denial appears disingenuous because, in his opposition, he relies on documents specifically showing his payment of rent under the Taxicab Lease and specifically referencing the Taxicab Lease itself. Arena further submits records identical, or substantively identical, to those submitted by Delux.

## POINT III

### THE COURT SHOULD NOT CONSIDER ARENA'S PROFFERED EXTRINSIC DECLARATIONS AND DOCUMENTS

Arena further submits his declaration, the declaration of his counsel, and many exhibits that are extrinsic to the Complaint and are not in any way referenced therein. "Courts in this

5

Circuit have made clear, however, that 'a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss'." *Malmsteen v. Universal Music Group, Inc.*, 10 Civ. 3955 (PAE), 2012 WL 2159281 at *3 (June 14, 2012) (copy attached) *quoting Madu, Edozie & Madu P.C. v. SocketsWorks Ltd. Nigeria*, 262 F.R.D. 106, 122-23 (S.D.N.Y. 2010).

Thus, this Court should not consider Arena's declaration and exhibits other than his Exhibit 4 noted in Point II above when considering Delux's motion to dismiss.

## POINT IV

### ALTERNATIVELY, THE COURT SHOULD CONVERT THE MOTION TO ONE FOR SUMMARY JUDGMENT

"Rule 12(d) [Fed.R.Civ.P.] gives district courts two options when matters outside of the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion for one under Fed.R.Civ. P 56 and afford all parties the opportunity to present supporting materials." *Fonte v. Bd. of Managers of Cont'l Towers Condo,* 848 F.2d 24, 25 (2d Cir. 1988) (citation omitted). In the instant case, alternatively, Delux respectfully requests that the Court convert the motion for one for summary judgment and afford the parties the opportunity to present supporting material.

The linchpin of Arena's wage claims is that he allegedly worked 72 hours per week, six days per week. In his opposition, Arena authenticates his business records that record dates that he leased a taxicab. *See* Rosenberg Declaration at Exhibit 4. A complete set of his records will show that he has never leased a taxicab for six days in a week, has never driven one for 72 hours in a week and that he only sporadically leased a taxicab. Notably, in his declaration, Arena does not allege that he worked such number of days or hours and his own records show that he

6

worked far less and frequently not at all. Arena cannot raise any genuine issue of fact supporting his wage claim even if, for argument, he were a Delux employee and not a taxicab driver subject to the FLSA exemption.

Additionally, Arena submits documents which show that he is an independent contractor and not Delux's employee. Wage claims under both the FLSA and New York law are amenable to resolution by summary judgment. *See e.g., Velu v. Velocity Express, Inc.*, 666 F.Supp.2d 300, 305-308 (E.D.N.Y. 2009) (discussing legal standards for determining employee or independent contractor status under the FLSA and New York law and granting summary judgment). Arena's documents, and corroborating documents and evidence that Delux could submit on a motion for summary judgment, establish Arena's independent contractor status. This evidence includes, but is not limited to:

(1) Arena's business records showing that he keeps all of the fares that he charges his passengers, that he does not account to Delux for his cash fares and tips, is credited for all of his charged fares and does not split any fares with Delux.

(2) Arena's business records showing that Arena alone selected the days when he leased a taxicab, that he leased a taxicab infrequently and not according to any fixed schedule, and Delux does not control or direct the days when he leases a taxicab.

(3) Arena's business records showing that he is responsible for the cost of operating the taxicab through his rental payment and the payment of fuel.

(4) Arena's business records showing that Delux does not withhold payroll taxes and Arena receives no employee benefits.

(5) Arena's execution of the Taxicab Lease at a time when he was litigating this case and receiving the advice of counsel.

(6) The Taxicab Lease itself.

(7) Evidence that Arena sets his own hours to drive a taxicab.

Documents submitted by Arena, showing that Delux has informed drivers of best-practices in the taxicab and livery business, do not negate his independent contractor status, including documents concerning automobile safety (Rosenberg Declaration at Exhibits 8, 9, 17 and 18), the proper operation of a motor vehicle (*id.* at Exhibits 12, 18), treating passengers with respect and courtesy and keeping a taxicab clean and safe (*id.* at Exhibits 11, 16, 17, 20 and 22), insuring that intoxicated minors get home safely (*id.* at Exhibit 21), handling charge accounts and credit cards (*id.* at Exhibit 15) and complying with the requirements of the New York State Department of Taxation and Finance with respect to collection of sales tax (*id.* at Exhibit 25).

## CONCLUSION

The Court should dismiss the Complaint with prejudice or alternatively, convert the motion to one for summary judgment.

Dated: New York, New York
       October 23, 2012

Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By: Theodore L. Hecht, Esq.
140 Broadway, Suite 3100
New York, New York 10005-1101
Telephone: (212) 973-8000
Facsimile: (212) 972-8798
Email: thecht@schnader.com

Attorneys for Defendants -
*Delux Transportation Services, Inc. and Peter Blasucci*

8

2012 WL 2159281
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Yngwie J. MALMSTEEN, Plaintiff,
v.
UNIVERSAL MUSIC GROUP, INC.,
UMG Recordings, Inc., Universal Music
Canada, Inc., and Universal Music
Group International Ltd., Defendants.

No. 10 Civ. 3955(PAE).   |   June 14, 2012.

Opinion

## OPINION & ORDER

PAUL A. ENGELMAYER, District Judge.

*1 In this diversity action, plaintiff Yngwie Malmsteen ("Malmsteen") brings breach of contract claims against four defendants associated with Universal Music Group: Universal Music Group Inc. ("UMG"); UMG Recordings Inc. ("UMG Recordings"); Universal Music Canada Inc. ("UM Canada"); and Universal Music Group International Ltd. ("International") (collectively, "Defendants"). Malmsteen alleges that three defendants—UMG, UMG Recordings, and UM Canada—failed to properly account to him for royalties stemming from a 1985 contract. The contract was originally signed by Polygram Records Inc. ("Polygram"), which Defendants represent was the predecessor to UMG Recordings. Malmsteen further alleges that International breached a separate 2006 oral agreement forbidding the commercial use of certain video footage.

Defendants filed a partial motion to dismiss on two grounds. First, Defendants argue that the Court lacks personal jurisdiction over UM Canada or International.[1] Second, Defendants claim that their liability on the first claim is limited by one or more limitations provisions in the parties' contract, and seek to exclude any claim barred thereunder. For the reasons that follow, the Court grants the motion to dismiss for lack of personal jurisdiction, and bars certain claims as untimely based on contractual limitations periods.

## I. Background[2]

### A. Malmsteen's Contract with UMG Recordings

Malmsteen is a professional recording artist based in Florida who is known for his technical ability as a guitarist. Compl. ¶¶ 1, 9. In November 1985, Malmsteen, through his loanout company, entered into a written contract with Polygram based on his personal services as a musician and a composer (the "Contract"). *Id.* ¶ 12. On or about April 3, 1989, the parties amended that Contract.[3] *Id.* ¶ 13. Under the Contract, Malmsteen was to deliver two full-length albums; the Contract also provided Malmsteen with three options to extend or renew, each of which required him to deliver two additional full-length albums. *Id.* ¶¶ 15–16. Malmsteen also claims that he authorized UMG Recordings to exploit a long-form audio-visual recording of a 1989 concert he had performed in the Soviet Union. *Id.* ¶ 18. The Contract limited Polygram to releasing no more than three "best of" compilations of Malmsteen's music without his approval. *Id.* ¶ 19. The Contract also prevented each party, without the prior consent of the other, from releasing for distribution and sale any audio-visual recording of Malmsteen that was taped or recorded at a single event or setting with a duration of 30 minutes or more. *Id.* ¶ 41. Malmsteen claims that he has delivered to UMG Recordings a total of six albums and that he has fulfilled his obligations under the Contract and two renewals. *Id.*

For albums sold through normal retail channels in the United States, the Contract set royalty rates under which the percentage that Malmsteen received on each album grew as it crossed certain sales milestones. Malmsteen's royalty percentage varied from 11–14%. *Id.* ¶¶ 21–24. Similarly, it provided for a graduated scale of royalty percentages for distributions outside the U.S., with the particular percentage differing by country of sale. *Id.* ¶¶ 25–28. The Contract authorized Polygram to charge a limited and defined set of costs (associated either with the albums or with certain video production costs) against Malmsteen's royalty account. *Id.* ¶¶ 31–35. Finally, the Contract contained a forum selection clause. It provided that "any action, suit or proceeding based upon any matter, claim or controversy arising [under the Contract] or relating [to the Contract] shall be brought solely in the state courts of or the federal court in the state and county of New York...." (Dkt. 45, Ex. 8 § 14.07.)

*2 Malmsteen alleges that representatives of International contacted him in 2006—after the exclusive term of the Contract had expired—to request an interview in his Miami, Florida, rehearsal studio. The interview was to be used only

to promote sales of albums under the Contract. Compl. ¶¶ 38–39. Malmsteen claims that he assented to the interview and entered into an agreement (the "Agreement") with International at that time which precluded commercial use of the interview footage with respect to any work not covered by the Contract. *Id.* ¶ 40. Malmsteen claims that, in breach of the Agreement, all four defendants subsequently began to sell a commercial DVD titled "Far Beyond the Sun," which included both interview footage and a single music performance in excess of 30 minutes. *Id.* ¶ 42.

On December 29, 2008, Malmsteen sent a letter to UMG Recordings stating that he had not "received complete statements or payments from [UMG Recordings or its] related affiliates" for his works under the Contract. Dalley 2d Decl. Ex. 10.

### B. The Complaint

The Complaint was filed on May 12, 2010; an Amended Complaint was filed January 6, 2012. It contains two causes of action, both sounding in breach of contract. First, it alleges that UMG, UMG Recordings, and UM Canada, all of which Malmsteen alleges were successors-in-interest to Polygram, owe Malmsteen for royalties that have not been paid to him on the Contract. It also seeks damages under the Contract for sales of the unauthorized DVD. *Id.* ¶¶ 44–50. Second, it alleges, International breached the Agreement by selling the unauthorized DVD without Malmsteen's knowledge and consent, and by exploiting footage of his 2006 interview. *Id.* ¶¶ 51–54. He seeks damages on each claim of more than $250,000. *Id.* ¶¶ 50, 54.

On April 11, 2012, Defendants filed a motion to dismiss the Complaint as to UM Canada and International for lack of personal jurisdiction, and to limit the scope of Malmsteen's royalty claims, based on limitations periods in the Contract. Oral argument was held on May 23, 2012.

## II. Personal Jurisdiction

### A. Applicable Legal Standard for Rule 12(b)(2) Motion

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant in question. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566–67 (2d Cir.1996) (citations omitted). On a motion made prior to discovery, a plaintiff may prevail based on legally sufficient allegations of jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt S.A.,* 902 F.2d 194, 197 (2d Cir.1990), *cert. denied,* 498 U.S. 854 (1990). Although personal jurisdiction must ultimately be proven by a "preponderance of the evidence, either at trial or at an evidentiary hearing, a district court making a determination based upon affidavits must resolve doubts in favor of the plaintiff, 'notwithstanding a controverting presentation by the moving party.' " *Jesselson v. Lasertechnics Inc.,* No. 96–cv–1452, 1997 WL 317355, at *1 (S.D.N.Y. June 12, 1997) (quoting *A.I. Trade Fin. Inc. v. Petra Bank,* 989 F.2d 76, 80 (2d Cir.1993)).

*3 When reviewing a motion to dismiss, a court may consider documents attached to the pleadings, as well as documents outside the pleadings "that are integral or relied upon by the plaintiff in preparing the pleadings." *Wolff v. Rare Medium Inc.,* 210 F.Supp.2d 490, 494 (S.D.N.Y.2002), *aff'd,* 65 F. App'x 736 (2d Cir.2003) (citing *Int'l Audiotext Network Inc. v. Am. Tele. and Tele. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). Courts in this Circuit have made clear, however, that "a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Madu, Edozie & Madu P.C. v. SocketWorks Ltd. Nigeria,* 265 F.R.D. 106, 122–23 (S.D.N.Y.2010) (citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998) (plaintiff could not amend her complaint through a legal memorandum filed in opposition to a motion to dismiss)).

### B. Personal Jurisdiction over International

Malmsteen acceded at oral argument to the dismissal of UM Canada. As to International—the sole defendant named in Count Two—the Court applies a two—part test to evaluate personal jurisdiction. First, the Court must decide whether, under New York law, there is personal jurisdiction over the defendant. *Grand River Enters. Six Nations Ltd. v. Pryor,* 425 F.3d 158, 165 (2d Cir.2005). The forum selection clause in the Contract is relevant to that issue. Second, if there is personal jurisdiction, the Court must determine whether "an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.*

Pursuant to the New York long-arm statute, a court in New York can exercise personal jurisdiction over a non-resident defendant based either on general jurisdiction, under New York Civil Practice Law and Rule § 301, or specific jurisdiction, under C.P.L.R. § 302. *A. W.L.I. Grp. Inc. v. Amber Freight Shipping Lines,* 828 F.Supp.2d 557, 563 (E.D.N.Y.2011). Specific jurisdiction exists when the

defendant transacts business in the forum (C.P.L.R. § 302(a)(1)), when a tortious act has been committed or causes injury there (C.P.L.R. § 302(a)(2) and (a)(3)), or when a defendant owns, uses, or possesses any real property situated within the state (C.P.L.R. § 302(a)(4)). Here, the only potential grounds for jurisdiction which Malmsteen identifies over International are: (1) general jurisdiction under C.P.L.R. § 301; (2) specific jurisdiction under § C.P.L.R. 302(a)(1); and (3) the forum selection clause.

**1. C.P.L.R. § 301's "Doing Business" Standard**
Malmsteen first argues that the Court has general personal jurisdiction over International under C.P.L.R. § 301, which provides for "personal jurisdiction over a non-domiciliary defendant whose business activities within New York are 'continuous and systematic.' " *Pieczenik v. Dyax Corp.*, No. 00–cv–243, 2000 WL 959753, at *2 (S.D.N.Y. July 11, 2000) (citing *Beacon Enter. Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983)), *aff'd,* 265 F.3d 1329 (Fed.Cir.2001). To be amenable to general jurisdiction under § 301, International must be doing business in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Beacon,* 715 F.2d at 762.

*4 Malmsteen relies, first, on a series of announcements on www.universalmusic.com, which follow the career trajectory of an alleged officer of International, Andrew Kronfeld. These suggest that Kronfeld is based in London and New York. Pl.'s Mem. 3–4. A 2009 announcement notes that Kronfeld would be responsible for overseeing the scheduling, promotion, and marketing of International's [4] releases worldwide in his role as vice president of a marketing arm of that company. (Dkt.44, Ex. 1.) A July 1, 2010 announcement notes Kronfeld's promotion to president of Universal Music Group's [5] global marketing division, and reiterates that he will be working in both London and New York. (Dkt .44, Ex. 4.) However, even assuming that these documents are properly considered on this motion and that their contents can be taken as true, [6] the facts therein fall far short of establishing personal jurisdiction under § 301.

New York courts have held that the mere presence of more than one nonresident officer of a company is not sufficient to confer jurisdiction. *See Fremay Inc. v. Modern Plastic Mach. Corp.,* 222 N.Y.S.2d 694, 700 (1961) ("The mere fact that two of the officers of [a] defendant reside in New York is of no particular moment."). Even a CEO who conducts some business from a New York office does not necessarily subject the company to general jurisdiction under § 301. *Jesselson,* 1997 WL 317355, at *3. It is " 'not so much a question of where the officers and representatives of the foreign corporation resided but of what they did here, of the acts they performed here for the corporation and in connection with its business.' " *Id.* (quoting *Stark v. Howe Sound Co.,* 252 N.Y.S. 233, 236 (1931)). Notably, *Jesselson* involved a New York-based CEO of a Delaware corporation with its principal place of business in New Mexico. The Court ultimately found jurisdiction, but it did so based on the allegation that the CEO "regularly and systematically control[led the company] from his office in New York." *Id.* No such allegations are made here, and Kronfeld, an apparently midlevel employee, is not even alleged to work full time in New York City.

Malmsteen next argues that because the CEO of a different entity, Universal Music Group, Lucian Grainge, is based in that company's New York office, and because "various division heads" report directly to Grainge, there is general jurisdiction over International. Pl.'s Mem. 5. The Court disagrees. Malmsteen does not make any concrete allegations about the relationship between either Grainge or Universal Music Group, on the one hand, and International, on the other. Instead, Malmsteen essentially asks the Court to pierce the corporate veil for the purpose of enabling him to establish jurisdiction. But piercing the veil is permissible only when the activities of the subsidiary reflect a disregard for the separate corporate existence of the parent. *See ESI Inc. v. Coastal Corp.,* 61 F.Supp.2d 35, 51 (S.D.N.Y.1999) (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F .2d 117, 120 (2d Cir.1984)); *see also Aboud v. Rapid Rentals Inc.,* No. 97–cv–1742, 1998 WL 132790, at *2 (S.D.N.Y. Mar. 24, 1998); *Palmieri v. Estefan,* 793 F.Supp. 1182, 1187–88 (S.D.N.Y.1992); *DCA Food Indus. v. Hawthorn Mellody Inc.,* 470 F.Supp. 574, 585 (S.D.N.Y.1979); *Titu–Serban Ionescu v. E.F. Hutton & Co.,* 434 F.Supp. 80, 82–83 (S.D.N.Y.1977), *aff'd,* 636 F.2d 1202 (2d Cir.1980); *Pub. Adm'r of N.Y. Cnty. v. Royal Bank of Canada,* 278 N.Y.S.2d 378, 381 (1967). Malmsteen has not alleged any facts that would support such a finding. Accordingly, Malmsteen fails to establish general jurisdiction over International.

**2. C.P.L.R. § 302(a)(1)'s "Transacting Business" Standard**
*5 To exercise specific personal jurisdiction over International under C.P.L.R. § 302(a)(1), two conditions must be met: (1) International must transact business in New York; and (2) the plaintiff's claim must arise from that

business activity. *Cutco Indus. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986) (citing *McGowan v. Smith,* 52 N.Y.2d 268, 272 (1981)). Malmsteen does not allege that his claim has anything to do with International's business in New York. His argument for specific jurisdiction thus falls far short of the mark.

**3. Contractual Forum Selection Clause**
Malmsteen next relies on the forum selection clause in his Contract with Polygram, which provides that "any action, suit or proceeding based upon any matter, claim or controversy arising [under the Contract] or relating [to the Contract] shall be brought solely in the state courts of or the federal court in the state and county of New York...." (Dkt. 45, Ex. 8 § 14.07). The validity of that clause is undisputed, but the parties part company over whether International is bound by it. For International to be bound, (1) the Agreement whose breach he claims must arise under or be related to the Contract; and 2) International must be either a successor-in-interest to Polygram, the signatory, or "closely related" to the actual successor-in-interest.

As to the first point, the Amended Complaint nowhere alleges any relationship between the 1985 Contract and the alleged 2006 oral Agreement with International. Count One, based on the Contract, is asserted against UMG, UMG Recordings, and UM Canada. Compl. ¶¶ 12–14, 44–50. Count Two, based on the Agreement, is asserted against International alone. *Id.* ¶¶ 52–54. The Amended Complaint is determinative. Malmsteen may not imply through vague insinuations in his brief, *see, e.g.,* Pl.'s Mem. 2, or at argument that the Contract and Agreement are somehow related. *See Serdarevic v. Centex Homes LLC,* 760 F.Supp.2d 322, 330 (S.D.N.Y.2010); *Yarborough v. Queens Auto Mall Inc.,* No. 08–cv–3179, 2010 WL 1223584, at *2 (E.D.N.Y. Mar. 23, 2010) ("Plaintiff[s] may not amend [their] complaint through [their] motion papers.") (citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998)).

In any event, Malmsteen fails to allege facts to support a finding that *International* is bound by the Contract as a successor-in-interest. The Amended Complaint itself alleges only that UMG, UMG Recordings, and UM Canada are successors-in-interest to the Contract. Compl. ¶ 14. Its omission of International from the list of entities bound by the Contract—*i.e.,* the list of entities that Malmsteen alleges inherited Polygram's interest in the Contract—defeats the belated suggestion that International is bound on this theory. *See* Pl.'s Mem. 7.

To be sure, International could still be bound as a non-signatory on the alternate theory that it is "closely related" to the signatory. *See Aguas Lenders Recovery Grp. v. Suez S.A.,* 585 F.3d 696, 701 (2d Cir.2009) ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound.") (quoting *Bonny v. Soc'y of Lloyd's,* 3 F.3d 156, 162–63 (7th Cir.1993)). A non-party is closely related to a dispute "if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." *Cuno Inc. v. Hayward Indus. Prods. Inc.,* No. 03–cv–3076, 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005) (quoting *Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir.1998)). Attempting to make this showing, Malmsteen in his brief claims that (1) some music contained on the "Far Beyond the Sun" DVD had been authorized pursuant to the Contract, and (2) International sells the DVD under the Contract. But Malmsteen's suggestion does not follow logically. The Amended Complaint simply does not support the thesis that International's interests are derivative of those of UMG Recordings or UMG (whom Malmsteen alleges were Polygram's successors, if International was not). It nowhere alleges that International violated the Contract by virtue of its alleged exploitation of interview footage and/or works not enumerated in the Contract. Quite the contrary, the Amended Complaint alleges that International negotiated a completely separate oral agreement with Malmsteen to govern the 2006 Miami interview, which was not covered by the Contract, executed some 20 years earlier.

*6 The only concrete connection that Malmsteen identifies between the Agreement and the original Contract is the fact that the DVD, allegedly, also contained works covered by the Contract. But no inference of a close relationship between International and UMG Recordings[7] can properly be drawn from this spare allegation. It reveals nothing about the connections or working relationship between these two entities. Malmsteen's attempt to treat International as a successor-in-interest to Polygram, the Contract signatory, or as "closely related" to Polygram's successor, is thus unsupported by the Complaint because it rests solely on Malmsteen's say-so.

The Second Circuit's decision in *Aguas Lenders* is fully in accord. *Aguas Lenders* recognized that non-signatories can be held accountable based on a close relation to a signatory, but it states that this outcome cannot be found absent adequate

allegations of such a relationship. 585 F.3d at 701–02. No such tangible allegations have been made here.

Accordingly, Malmsteen fails to establish personal jurisdiction under New York law. There is, therefore, no occasion to consider the ensuing question of whether jurisdiction would comport with due process norms.

### III. The Contractual Statute of Limitations

At the motion to dismiss stage, a court may "resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in [p]laintiffs' favor." *Serdarevic,* 760 F.Supp.2d at 328–29 (citing *Banks v. Corr. Servs. Corp.,* 475 F.Supp.2d 189, 195 (E .D.N.Y.2007)) ("If the interpretation of a contract is at issue, a court is 'not constrained to accept the allegations of the complaint in respect of the construction of the [a]greement,' although all contractual ambiguities must be resolved in the plaintiffs' favor.") (quoting *Int'l Audiotext,* 62 F.3d at 72).

The Contract contains both a limitation and objection provision. Together, Defendants claim, these operate to bar a significant portion of Malmsteen's damages claims. Contractual statutes of limitations and objection provisions are generally respected by New York courts. *See, e.g., Allman v. UMG Recordings,* 530 F.Supp.2d 602, 605 (S.D.N.Y.2008) (enforcing both a limitation and an objection provision against a plaintiff). Under the C.P.L.R., "[a]n action ... must be commenced within the time specified in this article unless ... a shorter time is prescribed by written agreement." C.P.L.R. § 201. Failure to conform to a contractual limitations period "will subject the action to dismissal, absent proof that the limitations provision was obtained through fraud, duress, or other wrongdoing." *Id.; see also Van Loan v. Hartford Accident & Indem. Co.,* No. 05–cv–1326, 2006 WL 3782709, at *4 (S.D.N.Y. Dec. 22, 2006) (holding that an insurance agreement's two-year limitation period was valid and enforceable and dismissing plaintiff's claim because it was filed after the limitation period). Malmsteen does not make any substantial argument that either of the provisions here is facially unenforceable.

*7 The central provision at issue prevents Malmsteen from bringing any action against Polygram "in connection with any royalty accounting or payments hereunder unless [Malmsteen] commences the suit within four (4) years from the date such statement of accounting for royalties or such payment was rendered." (Dkt. 45, Ex. 8 § 8.05(a).) The plain meaning of this provision precludes any claim in connection with an accounting (*i.e.,* statement) or payment rendered before May 12, 2006, which is four years to the day before Malmsteen filed his Complaint. Malmsteen does not appear to dispute that this date should govern.

The other relevant provision is the objection provision. It states that royalty statements rendered by Polygram to Malmsteen cannot be contested "unless specific objection in writing, stating the basis thereof, is given to [Polygram] within three (3) years from the date rendered. Failure to make specific objection within said time period shall be deemed approval of such statement." (Dkt. 45, Ex. 8 § 8.03(a).) The parties diverge as to whether Malmsteen's December 29, 2008 letter denying receipt of complete statements or payments was a "specific objection." If it was not, then Malmsteen would be limited by the three-year objection provision to challenging statements rendered within three years of the filing of the Complaint on May 12, 2010. If it was, then Malmsteen's claims are limited only by the four-year limitation provision.

The Court agrees with Malmsteen that, on a motion to dismiss, his contention that the December 29, 2008 letter was a "specific objection in writing" should be sustained.

Malmsteen's letter was clearly an attempt on his part to notify UMG Recordings that something was amiss. Less clear is whether Malmsteen could have been more specific as to his grievances. It is possible that, because he had not received the required statements, Malmsteen did not have a more specific understanding of the extent to which he had been denied royalties to which he was entitled. Defendants fault Malmsteen for being insufficiently specific, but pending discovery, the Court cannot conclude with certainty that Malmsteen had the data on which to particularize his objection. Further, at this stage of the litigation, the Court is bound to construe all facts in Malmsteen's favor.

The Court, therefore, finds that Malmsteen has alleged facts sufficient to support the claim that the letter constituted a specific objection. Thus, the Contract provision would allow Malmsteen to reach all the way back to December 29, 2005, three years before the letter, because Malmsteen's letter appropriately preserved such claims. That does not absolve Malmsteen of the separate duty to file his Complaint in a timely fashion, however, and under the Contract's provision on that point, he forfeited such claims arising before May 12, 2006.

In a final argument, Malmsteen notes that the Contract states that "[a]ll statements hereunder will be deemed conclusively to have been rendered on the due date ... unless [Malmsteen] notifies [Polygram] otherwise within thirty (30) days after such due date." (Dkt. 45, Ex. 8 § 8.03(b).) The Contract stipulates that those due dates are "on or before September 30 for the period ending the preceding June 30, and on or before March 31 for the period ending the preceding December 31."[8] (Dkt. 45, Ex. 8 § 8 .01.) On this basis, Malmsteen appears to argue that § 8.03(b) applies only when a statement has already been rendered, and that it cannot be used to bar, based on the limitations provision, his claims on a required statement that Defendants failed to issue. Pl.'s Mem. 9. Malmsteen also argues that applying the limitations clause to statements never issued is "inequitable on its face." *Id.*

**\*8** Malmsteen does not, however, cite to a single case to support this argument. At least one court in this District has found no defect in a provision similar to the one at issue. The provision there had conclusively deemed a royalty statement timely rendered on the stipulated due dates. *See Drum Major Music Entm't Inc. v. Young Money Entm't LLC,* No. 11–cv–1980, 2012 WL 423350, at \*2 (S.D .N.Y. Feb. 7, 2012). In *Drum Major Music,* the contract stipulated due dates of March 31 and September 30 for semi-annual royalty accountings; it prevented the plaintiff from suing over "royalty accounting and/or payments unless he brought suit 'within one (1) years [*sic* ] from the date such statement of accounting for royalties or such payment was due.' " *Id.* The Court found that "when [the plaintiff] received neither royalties nor an accounting, he was on notice that something might be amiss." *Id.* Similarly here, Malmsteen knew he was to receive accounting statements twice a year. He had the opportunity to notify UMG Recordings or an affiliate that his statements were erroneous, or had not been furnished, but he failed to do so until December 29, 2008.

Malmsteen's claim that this works an inequitable result is unpersuasive. Courts routinely enforce contractual limitations and objection provisions, and Malmsteen freely entered into those at issue here; he does not claim that the Agreement was the product of fraud or duress. The district court in *Allman,* in fact, rejected a similar challenge to a similar contract. UMG's contract there stated that all royalty statements rendered to Allman were binding and not subject to objection "for any reason unless specific objection, in writing, stating the basis thereof, is given to UMG within two (2) years from the date rendered"; it stated that Allman "will not have the right to bring an action against [UMG] in connection with any royalty accounting or payments ... unless [Allman] commence[s] the suit within three (3) years from the date such statement of accounting for royalties ... was rendered." 530 F.Supp.2d at 604.

Accordingly, the Court holds, Malmsteen may reach back four years from the date of the filing of the Complaint, to May 12,2006. The parties have agreed that under such a ruling, the royalties earned after March 31, 2006 are cognizable, and the Court accepts that understanding.

## CONCLUSION

Defendants' motion to dismiss UM Canada and International from this action is GRANTED. Consequently, Defendants' motion to dismiss Count Two of the Amended Complaint is GRANTED. Defendants' motion to dismiss all claims related to any statement rendered before the March 31, 2006 statement is GRANTED. The Clerk of the Court is directed to terminate the motion pending at docket entry number 34.

SO ORDERED.

Footnotes

1 Plaintiff conceded to the dismissal of UM Canada from this action during oral argument on May 23, 2012.

2 The following facts are drawn primarily from the amended complaint ("Compl.") (Dkt.31) and the parties' submissions; the plaintiff's allegations are taken as true for the purposes of resolving this motion. The parties' submissions include: (1) Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Defs.' Mem.") (Dkt.38); (2) Malmsteen's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Pl.'s Mem.") (Dkt.43); (3) Defendants' Memorandum of Law in Further Support of Their Motion to Dismiss Plaintiff's Amended Complaint ("Defs.' Reply") (Dkt.47); (4) the Declaration of John A. Dalley ("Dalley Decl.") (Dkt.23); and (5) the Second Declaration of John A. Dalley ("Dalley 2d Decl.") (Dkt.45).

3 The amendment is not germane to this action. As used herein, the "Contract" refers together to the 1985 Contract and the 1989 amendment.

| | |
|---|---|
| 4 | Defendants argue that Malmsteen has conflated Universal Music Group International, a trade name, with Universal Music Group International Ltd., the actual legal entity being sued. The announcement itself describes the unit as "Universal Music Group International." In light of the Court's finding that general jurisdiction is lacking even assuming synchronicity of the two names, it is unnecessary to run to ground the corporate organizational hierarchy. |
| 5 | Defendants argue that Malmsteen has erroneously referred to Universal Music Group as a legal entity, when it is only a trade name. The Court notes that Malmsteen also appears to misconstrue the announcement as indicating that the officer's promotion occurred within Universal Music Group International, when the document implies that his promotion resulted in a move *to* Universal Music Group. Here, too, however, it is unnecessary to resolve these fine points, because even if they were resolved in Malmsteen's favor, personal jurisdiction is lacking. |
| 6 | Admissibility of these unauthenticated Internet documents is dubious, and even if admitted, the Court would almost certainly lack authority to consider them, as they were neither attached to nor referenced in Malmsteen's Amended Complaint. Instead, Malmsteen's counsel submitted them along with his memorandum of law in opposition to the motion to dismiss. |
| 7 | Although not cognizable on a motion to dismiss, Defendants have conceded that UMG Recordings, as the successor to Polygram, was the successor-in-interest on the Contract. |
| 8 | This same provision allows Polygram (and, of course, its successor-in-interest) to change the accounting periods, but the payments must be dispensed semiannually. |

End of Document                                                     © 2012 Thomson Reuters. No claim to original U.S. Government Works.