UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

JOSEPH ARENA, on behalf of himself and all others
similarly situated,

                           Plaintiffs,

               -against-

DELUX TRANSPORTATION SERVICES, INC.,
LINCOLN HOLDING CORPORATION, WEBSTER
MANAGEMENT, WEBSTER MANAGEMENT, INC.,
WILLETS MANAGEMENT, INC., PORT
CONVEYANCE, DELUX TAXI OF LONG ISLAND,
DELUX LIMOUSINE SERVICE, BAY LIMOUSINE
AND ARROW ISLAND LIMOUSINE, INC. and any
other such related subsidiaries or affiliates of LINCOLN
HOLDING CORP., PETER BLASUCCI, an individual,
and ANDREA MAJER, an individual,

                         Defendants.

-----------------------------------------------------------------X

**ECF CASE**

Docket No.: 12-CV-01718 (LDW)(ARL)

---

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Theodore L. Hecht
SCHNADER HARRISON SEGAL & LEWIS LLP
140 Broadway, 31st Floor
New York, NY 10005
Tel.:   (212) 973-8000
Fax.:   (212) 972-8798

*Attorneys for Defendants*

Dated:  June 12, 2013

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................ii-iii

PRELIMINARY STATEMENT ...............................................................................1

REPLY ARGUMENT ............................................................................................2

POINT I    PLAINTIFF HAS FAILED TO RAISE A GENUINE TRIABLE
           DISPUTE OF FACT..............................................................................2

POINT II   THE TAXICAB EXEMPTION APPLIES ..............................................7

POINT III  PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE
           WAGE CLAIM......................................................................................9

CONCLUSION....................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 ...................................................................................................2, 9, 10

*Cariani v. D.L.C. Limo. Serv., Inc.*,
    363 F. Supp. 2d 637 (S.D.N.Y. 2005)......................................................................8

*D'Amico v. City of New York*,
    132 F.3d 145 (2d Cir. 1998).................................................................................1, 5

*Harris v. Sullivan*,
    968 F.2d 263 (2d Cir. 1992).....................................................................................8

*Ideal World Mktg., Inc. v. Duracell, Inc.*,
    15 F. Supp. 2d 239 (E.D.N.Y. 1998) .......................................................................9

*In re Western District Xerox Litig.*,
    850 F. Supp. 1079 (W.D.N.Y. 1994) ........................................................................9

*Martin v. Creative Mgmt. Group, Inc.*,
    No. 10-2214, 2010 U.S. Dist. LEXIS 66092 (S.D.N.Y. June 29, 2010) ...................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................1

*Mitchell v. Yellow Cab Co., Inc.*,
    36 Lab. Cas. (CCH) P65,220 (W.D. Tex. 1959)......................................................8

*Paolercio v. Allstate Ins. Co.*,
    No. 09-983, 2011 U.S. Dist. LEXIS 113633 (E.D.N.Y. Sept. 30, 2011) ...................1

*Powell v. Carey Int'l, Inc.*,
    490 F. Supp. 2d 1202 (S.D. Fla. 2006) ....................................................................8

*Rossi v. Associated Limousine Services, Inc.*,
    438 F. Supp. 2d 1354 (S.D. Fla. 2006) ....................................................................8

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998).....................................................................................2

*Trilegiant Corp. v. Sitel Corp.*,
    No. 09-6492, 2013 U.S. Dist. LEXIS 72828 (S.D.N.Y. May 20, 2013) ...................5

*Troll Co. v. Uneeda Doll Co.*,
    483 F.3d 150 (2d Cir. 2007)......................................................................................8

*Velu v. Velocity Express, Inc.*,
    666 F. Supp. 2d 300 (E.D.N.Y. 2009) .................................................................6

*Yellow Taxi Co. v. Nat'l Labor Relations Bd.*,
    721 F.2d 366 (D.C. Cir. 1983) ...........................................................................3

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

29 U.S.C. § 213(b)(17) ...............................................................................................7

Fed. R. Civ. P. 56(e)(2)...............................................................................................1

**STATE: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

N.Y. Rules of Prof'l Conduct 3.7 ..............................................................................10

N.Y. Tax Law § 1111(o)(1)-(3) ...................................................................................3

**OTHER AUTHORITIES**

Webster's Third New Int'l Dictionary (2002) ..............................................................7

## PRELIMINARY STATEMENT

Defendants ("Delux") submit this memorandum in reply to plaintiff Joseph Arena's opposition to Delux's motion for summary judgment. (Defined terms in Delux's moving papers are incorporated herein.) Plaintiff's counterstatement responding to Delux's Rule 56.1 statement fails to "properly address [Delux's] assertion[s] of fact as required by Rule 56(c)." Fed. R. Civ. P. 56(e)(2). Specifically, plaintiff's counterstatement either does not cite to admissible evidence, the citation does not support the statement, or it responds argumentatively. Here, plaintiff's "failure to respond or contest the facts . . . constitutes an admission of those facts and those facts are accepted as being undisputed." *Paolercio v. Allstate Ins. Co.*, No. 09-983, 2011 U.S. Dist. LEXIS 113633, at *3 (E.D.N.Y. Sept. 30, 2011) (internal quotation marks omitted) (copy attached).

Instead of complying with Rule 56.1, plaintiff submits an unauthorized 214-paragraph "statement of undisputed facts." Plaintiff has not cross-moved for summary judgment. While Rule 56.1(b) allows plaintiff to set forth "a short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried," plaintiff's 50-page statement is merely a device to evade this Court's 25-page limit for memoranda of law. Plaintiff's statement of undisputed facts should be stricken.

To survive summary judgment, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Critically, at this point, he must "offer some hard evidence showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

Plaintiff's declaration is replete with "[c]onclusory allegations" and "unsubstantiated speculation," lacking in citation to any hard evidence, which is insufficient to overcome summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  And although plaintiff submits 100 exhibits (without testimony or context) in an effort to create the illusion of factual disputes, ultimately there is no "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 ("the mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient").

## REPLY ARGUMENT

### POINT I

### PLAINTIFF HAS FAILED TO RAISE A GENUINE TRIABLE DISPUTE OF FACT

Plaintiff argues he was a Delux employee because Taxicab Leases I and II were "nothing but a sham" since Delux Transportation Services, Inc. had "no cars to lease" and, therefore, plaintiff could not contract with a "shell company."  Plaintiff's Mem. at 1-2.  The undisputed evidence, however, is that both parties consistently performed in accordance with the Taxicab Lease's terms.  Even if plaintiff failed to read the leases, as he now contends, *see* Plaintiff's Mem. at 2, he is still "bound by [their] terms." *Martin v. Creative Mgmt. Group, Inc.*, No. 10-2214, 2010 U.S. Dist. LEXIS 66092, at *4 (S.D.N.Y. June 29, 2010) (copy attached). Additionally, the undisputed evidence is that he signed two separate Taxicab Leases, and, at the time he signed Taxicab Lease II on July 19, 2012, he was represented by counsel in this lawsuit and in another pending lawsuit in this Court and that he signed Taxicab Lease II having the benefit of the advice of his counsel.  Plaintiff's "sham" argument does not raise a triable issue of fact.

In his amended complaint, plaintiff alleges that Delux "withheld taxes" and thereafter converted the funds when it allegedly failed to turn-over the withheld taxes to the taxing

authority.  In its moving papers, Delux, based on undisputed evidence, showed that it did not withhold any taxes, but plaintiff paid Delux sales taxes in accordance with the requirements of New York State Law which Delux remitted to the State.  *See* Loolam Decl. ¶¶ 9-15; *see also* N.Y. Tax Law § 1111(o)(1)-(3).  In opposition, plaintiff abandons his conversion claim and now asserts, for the first time, that Delux's proper and timely filing of sales tax returns, through its sibling corporation Motown, is "indicative that there was no true independent contract relationship."  Plaintiff's Mem. at 2.  There is no evidentiary or legal support, whatsoever, for his obtuse assertion.  Indeed, plaintiff's payment of sales tax, and the total absence of withheld payroll taxes, is, in fact, indicative of his independent contractor status.

Plaintiff conjures up a list of purported "policies" that he claims shows Delux exercised a "significant degree of control" over him.  *See* Plaintiff's Mem. at 6-8.  For example, plaintiff alleges that he had to report any mechanical problems with the taxicabs; could not hang items in the front mirror for safety reasons; had to keep the taxicabs clean and greet customers in a friendly manner; and use vocabulary common to the taxi industry when communicating via radio.  *See id.* at 5-6.  "[T]o whatever extent these might be styled 'controls,'" all of them "fall into that category of standards of conduct to which all of the drivers should adhere in order to support the company's image for the mutual benefit of [the company] and its drivers"—they do not indicate that plaintiff was an employee of Delux.  *Yellow Taxi Co. v. Nat'l Labor Relations Bd.*, 721 F.2d 366, 380 (D.C. Cir. 1983).

Moreover, even though Arena alleges that he was "given an orientation packet containing Exhibits 1-3, 6-9, 11-28, and 30-33," Arena Decl. ¶ 7, he fails to identify a single specific event, conversation, or personal transaction showing that he was actually subject to these documents. In fact, some of the very documents he submits on their face do not apply to taxicab lease

3

drivers. *See* Plaintiff's Exs. 7, 19, 32, 33 (applying only to salary town car and limousine drivers). Further, nowhere in his 100 exhibits is there any evidence that he, or anyone else, was ever disciplined by Delux for failing to conform.

Although plaintiff's brief mentions a dress code, *see* Plaintiff's Mem. at 7, there is no citation to any evidence in support. Moreover, plaintiff's own declaration makes no mention of a required dress code. In fact, the evidence flatly contradicts that notion; lease drivers could wear whatever they wanted. *See* Majer Dep. at 121:7-9 (the Declaration of David Rosenberg attaches this and the deposition transcripts of Valorie Loolam, Peter Blasucci and Donna Furino).

Plaintiff also complains that Delux did not allow him to "cruise" for passengers, charge any fare that he wanted, or alter a credit card charge slip after the passenger signed it (which, notably, is a crime). *See* Plaintiff's Mem. at 7. These are merely statutory requirements and not indicative of employer control. *See* Delux Memorandum of Law in Support of Their Motion for Summary Judgment ("Delux Mem.") at 12-13. In addition, plaintiff argues that his brief training session is evidence of Delux's control, *see* Plaintiff's Mem. at 5, but it is well-established that independent contractors do not become "employees" by attending training sessions. Delux's Mem. at 12 n.5.

Plaintiff contends that Delux controlled his schedule because he had to choose between morning and afternoon shifts, was told he had to work at least one weekend day, and had to create a special holiday schedule. *See* Plaintiff's Mem. at 6. But the undisputed business records, including records prepared by Arena, show the exact opposite. The very records that plaintiff submits show that he leased cabs during different hours each day, without any set shift times or increments. *See* Rosenberg Decl. Ex. 4 (showing different start and end times each day). Further, contrary to his conclusory allegation, it is undisputed that out of 40 calendar

4

weeks, plaintiff leased a taxicab only 5 times on a weekend day.  Loolam Decl. Ex. D.  Plaintiff does not identify a single holiday where he leased a taxicab.

Plaintiff asserts that Delux exercised "control over rides."  *See* Plaintiff's Mem. at 6-7. Plaintiff's self-serving, conclusory assertion is not supported by any admissible evidence.  *See, e.g.*, *Trilegiant Corp. v. Sitel Corp.*, No. 09-6492, 2013 U.S. Dist. LEXIS 72828, at *15 (S.D.N.Y. May 20, 2013) ("self-serving affidavits, standing alone, are insufficient to create a trial issue of fact and defeat a motion for summary judgment") (copy attached).  Plaintiff has failed to dispute by competent evidence the evidence submitted by Delux detailing that (1) plaintiff was not obligated to accept passengers that Delux dispatched, (2) plaintiff, in fact, routinely refused to accept dispatched calls (including passengers going in the same direction who had come into the taxi office and elderly or disabled passengers), (3) plaintiff took breaks whenever he wanted without any penalty, and (4) plaintiff ran personal errands in his taxicab and Delux never told him he could not do so.  *See* Dennis Decl. ¶¶4-16, 17-19.  Also, even though plaintiff concludes in his declaration (without any evidentiary support) that he was not allowed to give out his phone number to customers or leave his taxicab without permission, the undisputed testimony, again, refutes that allegation.  *See* Furino Dep. 137-38.  Thus, this argument suffers the same problem as the rest:  there is no "hard evidence showing that [plaintiff's] version of the events is not wholly fanciful."  *D'Amico*, 132 F.3d at 149.

The fact that Delux kept a file concerning plaintiff is not evidence of an employer-employee relationship.  *See* Plaintiff's Mem. at 8 (citing Furino Dep.).  It is undisputed that Delux kept a file with information in the event of an emergency and a copy of plaintiff's taxicab license.  *See* Furino Dep. at 57:14-23.  Plaintiff cites no authority suggesting that merely keeping such a file transforms an independent contractor to an employee.

Next, plaintiff argues, without any evidentiary support, that Delux controlled the opportunity for profit and loss and that his position required only a low level of skill and independent initiative because his work was limited to the calls that he received through the Delux dispatch system. *See* Plaintiff's Mem. at 8-9. Once more, the undisputed admissible evidence flatly contradicts this conclusory allegation. In addition to receiving calls from the dispatch office, plaintiff could and did pick up passengers who would hail rides from designated taxicab stands and/or call him directly. *See* Hecht Decl. Ex. A (Arena Dep.) at 70:16-20 (acknowledging that "there were times when [plaintiff] picked up a passenger while [he] was sitting in the taxi line" at the stands); Dennis Decl. ¶ 2 ("[p]assengers also arrange rides directly with the taxicab drivers at taxi stands authorized by the Town of North Hempstead or telephone a driver directly"); Blasucci Dep. at 154:22-156:21 ("[Lease drivers] can go to any taxi stand they want in the Town of Hempstead and solicit, and they also solicit the bus stops"); Majer Dep. at 105:9-10 ("[m]any of the drivers sit at the hack stand and get their own fare"). Plaintiff fails to dispute the specific evidence that he routinely chose to refuse calls from dispatch, carved out time to run personal errands in his taxicab, failed to make himself available during rush hour or busy holidays, was contacted directly by passengers and would leave before the end of his rental without waiting to see if business would pick up — all of which were his *own* decisions and impacted his ability to turn a profit. Dennis Decl. ¶¶ 5, 9, 11-13, 18, 19.

Plaintiff's conclusion that the operation of leasing taxicabs is the "most integral part of Defendants' business," Plaintiff's Mem. at 10, is not supported by admissible evidence. *See* Blasucci Decl. ¶¶ 5-12 (explaining different facets of Delux's business). And, even if it were true, because plaintiff's work is "interchangeable with the work of other drivers," this does not show there was an employer-employee relationship. *Velu v. Velocity Express, Inc.*, 666 F. Supp.

2d 300, 307 (E.D.N.Y. 2009); *see also* Blasucci Decl. ¶ 43 (plaintiff was "replaceable" to Delux's taxicab business).

Finally, plaintiff contends that Delux advertised for "employment" opportunities on its website, which, according to him, is "highly probative" of an employer-employee relationship. Plaintiff's Mem. at 11.  Plaintiff's argument is misleading.  He fails to mention that the website differentiates between "taxi drivers," like plaintiff, who are independent contractors, and "driver/employee[s]," who, as the website states, are employees. *See* Rosenberg Decl., Ex. 35 at 7.

## POINT II

### THE TAXICAB EXEMPTION APPLIES

Despite plaintiff's views about statutory construction, "interpretive clues," comparisons between different statutes, and *Chevron* deference, plaintiff's argument boils down to a very simple contention:  a vehicle can never be a "taxicab" under the FLSA exemption unless (1) it is equipped with a meter and (2) passengers are allowed to hail a ride.  Plaintiff is incorrect.

Plaintiff does not cite any authority supporting his bright-line rule that, to be a "taxicab" under Section 213(b)(17), a vehicle must always have a meter.  Plaintiff's "plain meaning" of the word comes from cherry-picked dictionary definitions—other dictionaries, which he fails to cite, do not define the word so narrowly. *See, e.g.*, Webster's Third New Int'l Dictionary (2002) ("chauffeur-driven automobile available on call to carry a passenger between any two points (as within a city) for a fare determined by taximeter, zone system, or flat rate").

More importantly, the New York Department of Labor defines a taxicab driver as "transporting passengers on a zone or meter basis" and the Town of North Hempstead defines "taxicab" without reference to meters and only authorizes fares on a zone basis. *See* Delux Mem. at 19, 22-23.  The way the State and Town define the words embody the "ordinary,

contemporary, common meaning." *Harris v. Sullivan*, 968 F.2d 263, 265 (2d Cir. 1992).  If plaintiff's definition were correct, it would lead to the absurd result that there are no taxicabs in the Town of North Hempstead, despite the Town having an entire set of laws governing "taxicab" licenses and operation. *See, e.g., Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007) ("we must interpret the statute to avoid such an absurd result").

Case law confirms that the taxicab exemption applies to non-metered vehicles. *See, e.g., Cariani v. D.L.C. Limo. Serv., Inc.*, 363 F. Supp. 2d 637, 639 (S.D.N.Y. 2005) ("None of the cars is metered"); *Mitchell v. Yellow Cab Co., Inc.*, 36 Lab. Cas. (CCH) P65,220 (W.D. Tex. 1959) ("[T]axicab drivers in the employ of a taxicab company who furnish local transportation in either metered or unmetered taxicabs . . . are in any event without FLSA protection").  None of the cases from other jurisdictions on which plaintiff relies mandates that, to be a "taxicab," the vehicle *must* be metered; it was simply a consideration. *See* Plaintiff's Mem. at 22-23.  In fact, *Herman v. Brewah Cab, Inc.*, on which plaintiff relies, supports Delux's position.  Unlike in *Brewah*, which concluded that ambulette minivans were not taxicabs, here (1) plaintiff never adhered to a pre-arranged work schedule, (2) drivers, including plaintiff, picked up passengers of his choosing at taxi stands and the drivers and the taxicabs are licensed by the Town of North Hempstead as taxi drivers and taxicabs, and (3) all of the leased vehicles have the familiar taxi signs on their roofs.[1]

---

[1]   The remainder of the cases plaintiff cites are distinguishable.  In *Rossi v. Associated Limousine Services, Inc.*, unlike here, it was undisputed that the company advertised itself as a limousine service, did not own or operate a taxicab, and was not licensed to provide taxicab transportation. 438 F. Supp. 2d 1354, 1363 (S.D. Fla. 2006).  In *Powell v. Carey Int'l, Inc.*, unlike this case, the company had pre-arranged contracts with local hotels, corporate clients, and destination management companies and also utilized "large cars that are not traditionally recognized as taxicabs." 490 F. Supp. 2d 1202, 1213 (S.D. Fla. 2006).

Nor does the definition of "taxicab" hinge on whether passengers can hail the vehicle. Actually, the Department of Labor letter on which plaintiff relies says as much. *See* DOL Opinion Ltr. (Plaintiff's Ex. 94) ("While it is not necessary that all the transportation be provided to persons who 'flag down' the vehicles . . . ."). In any event, the evidence shows that plaintiff did, in fact, pick up passengers who would hail his taxicab from designated taxi stands in the Town of North Hempstead. *See* Hecht Decl. Ex. A (Arena Decl.) at 70:16-20 (plaintiff admitting that he picked up passengers at the taxi stand); Dennis Decl. ¶ 2 (same); Blasucci Dep. at 154:22-156:21 (same). Thus, even if this were a requirement (which it is not), plaintiff's argument lacks any merit.

## POINT III

### PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE WAGE CLAIM

In its moving papers, Delux showed that there is no admissible evidence to support even a prima facie showing of plaintiff's FLSA and NYLL wage and hour claims. *See* Delux Mem. at 19-21, 23. In his opposition, plaintiff does not point to even a "scintilla of evidence" to support these claims. *Anderson*, 477 U.S. at 252. Plaintiff, in his declaration, not only fails to even state the amount he earned and the amount he was allegedly underpaid, he never even claims that he was ever underpaid. Instead, the only thing he offers is the declaration of Bryan Arbeit, Esq.—one of his own attorneys in this case—who purportedly "reviewed" "selected" records and has formed his own opinion about them (despite not being an expert witness).

Mr. Arbeit's declaration is wholly inadmissible. "The attorney's assertion in an affidavit on a summary judgment motion is just as inadmissible as it would be in a trial on the merits." *In re Western District Xerox Litig.*, 850 F. Supp. 1079 (W.D.N.Y. 1994); *accord Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 244 n.2 (E.D.N.Y. 1998) (an attorney's testimony about "the legal significance of facts is inadmissible"). In fact, the rules prohibit this: "A lawyer

9

shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact . . . ." N.Y. Rules of Prof'l Conduct 3.7. And, even if Mr. Arbeit's declaration could be considered, it fails to raise a genuine triable issue because it is based on incomplete information selectively culled by Mr. Arbeit, and fails to include in its analysis plaintiff's full cash receipts, including taxi stand and direct solicitation cash fares, tips and surcharges.

Finally, plaintiff does not attempt to defend his conversion claim. Other than referring to it in passing, *see* Plaintiff's Mem. at 2, plaintiff fails to mention any of the elements of that claim, does not explain what Delux allegedly converted or what his ownership interest was, and does not identify damages, if any, that he incurred. There is not a "scintilla of evidence in support of the plaintiff's position." *Anderson*, 477 U.S. at 252. Accordingly, summary judgment should be entered on plaintiff's conversion claim as well.

## CONCLUSION

The Court should grant Delux's motion.

Dated: New York, NY
June 12, 2013

Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By:  Theodore L. Hecht, Esq.
140 Broadway, Suite 3100
New York, NY 10005-1101
Tel.:  (212) 973-8000
Email:  thecht@schnader.com
*Attorneys for Defendants*



ROSEANN PAOLERCIO, Plaintiff, -against- ALLSTATE INSURANCE CO., Defendant.

09-CV-983 (NGG) (JO)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2011 U.S. Dist. LEXIS 113633*

September 30, 2011, Decided
September 30, 2011, Filed

**COUNSEL:** [*1] For Roseann Paolercio, Plaintiff: Thomas F. Bello, LEAD ATTORNEY, Thomas F. Bello, Esq. P.C., Staten Island, NY.

For Allstate Insurance Company, Defendant: Joan M. Schwab, LEAD ATTORNEY, Jakob Benjamin Halpern, Saiber LLC, Florham Park, NJ.

**JUDGES:** NICHOLAS G. GARAUFIS, United States District Judge.

**OPINION BY:** NICHOLAS G. GARAUFIS

**OPINION**

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Rosearai Paolercio ("Paolercio") alleges that Defendant Allstate Insurance Co. ("Allstate"), her former employer, discriminated against her on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. §§ 621-634.* (Compl. (Docket Entry # 1).) Paolercio brings claims for disparate impact and disparate treatment, alleging that she was unlawfully terminated as a result of Defendant's discrimination. (Id.)

Defendant Allstate has moved for summary judgment on all claims under *Federal Rule of Civil Procedure 56.* (Def. SJ Mot. (Docket Entry # 27).) For the reasons set forth below, Defendant's motion is granted in its entirety.

**I. BACKGROUND**

**A. Plaintiff's Rule 56.1 Statement**

With its Motion for Summary Judgment, Defendant filed a Statement of Material Facts, as required by Local Rule 56.1.[1] [*2] (Docket Entry # 27-3.) Plaintiff also filed a document entitled "Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment." (Pl. R. 56 Statement (Docket Entry # 31-1).) Plaintiff's submission, however, fails to comply with Local Rule 56.1. In most instances, where Plaintiff disputes a fact asserted by Allstate, Plaintiff writes only "Disputed" without any further explanation, and--contrary to Local Rule 56.1(d)--Plaintiff does not include citations to admissible evidence in the record. See Local R. 56.1(d) ("[E]ach statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by *Fed. R. Civ. P. 56(c)*).

1   Local Rule 56.1 provides as follows:

(a) Upon any motion for

2011 U.S. Dist. LEXIS 113633, *2

summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, there shall be annexed to the notice of motion a separate short and concise statement, numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary [*3] judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.

(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

(d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by *Fed. R. Civ. P. 56(c)*.

"Generally, the plaintiffs' failure to respond or contest the facts set forth by the defendants in their Rule

56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003)* [*4] (internal quotations omitted): see also *Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000)*. The court "endeavors, however, to avoid penalizing parties harshly as a result of technical errors by their attorneys, and will deem the facts set forth in plaintiffs memorandum of law sufficient to satisfy Rule 56.1 to the extent that the rule is otherwise complied with. However, where a stated fact is nowhere controverted, it will be deemed admitted." *Jessamy, 292 F. Supp. 2d at 504-05*. Here, however, neither Paolercio's brief in opposition to Defendant's motion nor the portion of her Rule 56.1 statement in which she attempts to dispute Defendant's assertions contains any citation to facts in the record. (See Pl. R. 56 Statement; Pl. Opp. (Docket Entry # 31).)[2] Because these documents, absent citation, are of minimal usefulness, the court must look to Defendant's Rule 56.1 Statement for an account of the underlying facts to the extent that this statement is supported by admissible evidence in the record. See *Jessamy, 292 F. Supp. 2d at 505* (finding that the court was "left with no choice but to treat as admitted all statements of fact contained in defendants' Rule 56.1 Statement that are [*5] supported and verified by admissible evidence contained in the record," where plaintiff failed to include citations); *Shepard v. Frontier Comms. Servs., Inc., 92 F. Supp. 2d 279, 284 (S.D.N.Y. 2000)* ("[P]laintiff's Rule 56.1 statement includes several statements of disputed facts that are not supported by a citation to the record . . . . Although not grounds for deeming all of the material facts set forth by defendants' Rule 56.1 statement as true, this Court will not consider any statements made by plaintiff in her Rule 56.1 statement that are not supported by a citation to the record.").

2    Plaintiff includes no citations where she attempts to dispute Defendant's asserted facts. (See Pl. R. 56 Statement at 1-3.) In her separately numbered statement of facts that follows, however, Paolercio does cite to her own deposition testimony. (Id. at 4-5.) The court considers the cited statements to the extent that they are admissible.

**B. Facts**

Paolercio began working for Allstate in 1983.

(Paolercio Deposition Transcript ("Pl. Dep."), Ex. A to Halpern Decl. (Docket Entry # 27-5) 9:2-4.) Prior to 2002, Paolercio worked in the Staten Island Claims Office; and, from 2002 until her termination, Paolercio [*6] worked in the Sheepshead Bay Claims Office. (Id. 21:9-13.) From 1984 to 1998, Plaintiff worked as a claims representative and adjuster in units that handle the review and payment of "no fault" insurance claims. (Id. 10:12-11:23; see also Valente Decl. ¶ 4.) In 1998, Plaintiff transferred to a "bodily injury claims" unit, where she worked until 2006. (Pl. Dep. 11:22-23,13:7-15.) In 2006, Allstate transferred Plaintiff back to a no fault unit, where she remained until her employment was terminated in 2008. (Id. 11:24-12:5.)

Prior to 2004, Paolercio performed her job satisfactorily. She received several promotions. (Pl. Dep. 11:2-3.) And, as her annual performance evaluations indicated, her supervisors consistently rated her highly. Allstate used a five-point scale to describe employees' overall performance: Employees could earn ratings of Exceeds, Meets, Successful, Fair, or Unacceptable. (See Ex. F to Halpern Decl. at ALL0051.) From 1983 to 2004, all of Paolercio's ratings fell in the two highest categories, Meets and Exceeds. (Ex. D to Halpern Decl. at ALL00009-10.)

In 2004, however, Paolercio's performance began to decline. Paolercio was rated "Fair" in her mid-year evaluation, which [*7] noted that she needed to work on the timely completion of new file assignments and on increasing her rate of file disposition. (Pl. Dep. 71:20-72:21; Ex. E to Halpern Decl. at ALL00060-61.) In 2005, Paolercio's evaluations again noted her need to improve file disposition (Ex. F to Halpern Decl. at AL00054 (mid-year evaluation)) and her need to improve timely work on her new files (Pl. Dep. 70:7-20 (year-end evaluation)). In 2004, 2005 and 2006, Plaintiff received year-end ratings of Successful. (Ex. E to Halpern Decl. at ALL00060-61.)

Allstate no fault adjusters receive five to ten files per day, and they are required to review each new file within 24 hours. (Pl. Dep. 78:6-19; Ex. D to Halpern Decl. at ALL00012.) In June of 2007, Paolercio's supervisor, Madeline Valente, discovered that Paolercio had 64 unreviewed new files in her desk. (Valente Decl. ¶ 10; Ex. D to Halpern Decl. at ALL00013; Pl. Dep. 84:3-7.) Valente warned Paolercio about her performance, and made several changes in order to

enable Paolercio to catch up on her overdue assignments.3 (Valente Decl. ¶ 11; Pl. Dep. 84:8-85:3, 90:19-25.) But, by December of 2007, Paolercio's performance had declined further; [*8] at that time, she had 87 unreviewed files and 359 bills over 26 days old. (Pl. Dep. 92:6-20; Valente Decl. ¶ 15; Ex. D to Halpern Decl. at ALL0013.) Paolercio received ratings of Fair on both her mid-year and year-end performance evaluations in 2007. (Ex. H to Halpern Decl. at ALL0037; Pl. Dep. 31:23-32:15.) These ratings were based on Paolercio's failure to meet minimum Allstate requirements, as well as certain New York state regulatory standards. (Ex. H to Halpern Decl. at ALL0038; Pl. Dep. 35:7-41:8.)

3   Among other things, Valente temporarily stopped assigning Paolercio new files.

Shortly after her 2007 year-end review, Plaintiff received an Unacceptable Performance Notification ("UPN"), which notified her that she needed to improve her performance and meet enumerated statistical benchmarks within a 90-day period--between March 11 and June 11, 2008--in order to avoid termination. (Pl. Dep. 61:2-20; Ex. H to Halpern Decl. at ALL00041; Valente Decl. ¶ 21.) Paolercio did not achieve the UPN goals. She did not resolve her pending unreviewed files (Pl. Dep. 106:25-108:4, 130:11-131:18), and she fell further behind on payments/denials within 30 days, proper denials, timely interest, and interest [*9] paid. (Id. 108:5-109:11, 125:21-127:2; Ex. D to Halpern Decl. at ALL00015.) Paolercio also failed to utilize remedial measures imposed by the UPN, including online learning courses and weekly sit-alongs with her supervisor. (Valente Decl. ¶ 23 (noting that Paolercio failed two of three online learning courses, and did not complete the third); Pl. Dep. 102:13-104:14, 134:5-11.)

Consequently, Plaintiff was informed that her termination was being recommended. (Pl. Dep. 134:12-14.) On August 6, 2008, a written Termination Request was submitted, which detailed the reasons for Paolercio's termination. (See Ex. D to Halpern Decl.) This document included Plaintiff's employment history with Allstate, a copy of her UPN, a chronology of events leading up to the UPN, and a comparison of Paolercio's performance with that of her co-workers. (Id.) Of the five no fault adjusters in her unit, Paolercio had the most experience. (Valente Decl. ¶ 8.) The statistics in the Termination Request, however, showed that her performance fell below that of other no fault adjusters in

her unit in a number of areas. (See Ex. D to Halpern Decl. at ALL00021 (statistical comparison of Plaintiff's performance versus [*10] peers' performance).) Notably, as of June 2008, Paolercio had 1366 bills over 26 days old, whereas each of her co-workers had between 26 and 345 such bills. (Id.) Paolercio was handling significantly fewer claims than other employees in her unit. (See id. (showing that Paolercio had 241 pending coverages, whereas each of her co-workers had between 692 and 841).)

Ultimately, Allstate terminated Paolercio on August 28, 2008. (Valente Decl. ¶ 31.) Paolercio's work was divided among the remaining no fault adjusters in her unit, and no new employee was hired to replace her. (Id.) At the time of Paolercio's termination, she was 52 years old.

**C. Paolercio's Allegations of Discrimination**

Paolercio alleges that Allstate discriminated against her on the basis of age. She brings claims for disparate treatment and disparate impact under the ADEA, *29 U.S.C. §§ 621-634*. (Compl.)

1. Disparate Treatment

Paolercio concedes that she "does not have documentation or smoking gun evidence" to support her claim of discrimination. (Pl. Opp. at 4.) Rather, Paolercio's disparate treatment claim hinges on her allegation that she was held to a higher standard than other employees. Paolercio argues that "she was given [*11] more work than others and therefore this overload caused her to fall behind." (Id. at 7.) Although Paolercio acknowledges that she "fell short" of the benchmarks set in her UPN, she argues that at least some of these shortfalls were minor. (Id. (stating that she *almost* performed up to standard in two UPN categories).) Paolercio points to categories in which her performance was admittedly sub-par but, in her estimation, not so far "below standard [as to] warrant[] termination" and argues that "[t]hese examples show a scrutiny unmatched by any other employee." (Id.)

2. Disparate Impact

Paolercio argues that Allstate engaged in a pattern of discrimination against older employees, which amounted to disparate impact. (See id. at 7-8.) In her deposition testimony, she provided names of several other older

employees who were terminated or stepped down. She claimed that three older employees, in other Allstate offices, were terminated the same week as she was. (Id.; Pl. Dep. 205:25-206:9.) Paolercio did not provide any testimony or additional evidence about these other employees, their job performances, or the circumstances surrounding their terminations.

**II. LEGAL STANDARD**

A motion for summary [*12] judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. See *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*.

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*.

*Rule 56(c)* "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof [*13] at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id. at 323*. A grant of summary judgment is proper "when no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219,1224 (2d Cir. 1994)*.

**III. DISCUSSION**

**A. Disparate Treatment**

The ADEA prohibits employers from taking adverse action against an employee because of the employee's age. *29 U.S.C. § 623(a)*. In the Second Circuit, ADEA claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. See *Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000)* (extending McDonnell Douglas burden-shifting analysis to the ADEA); *Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106* (affirming the continued applicability of the McDonnell Douglas framework after the Supreme Court's decision in *Gross v. FBL Financial Services, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)*).

Within [*14] this framework, a plaintiff must first establish a prima facie case of discrimination. *Gorzynski, 596 F.3d at 106*. To do so, the plaintiff must demonstrate that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Id. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory rationale for its actions. Id. If the defendant offers a neutral explanation for its actions, the burden shifts back to the plaintiff, who can no longer defeat summary judgment by relying only on the prima facie case. Id.

The Supreme Court's recent decision in Gross v. FBL Financial Services changes the third step of this formulation. *Gorzynski, 596 F.3d at 106; Gross, 129 S. Ct. at 2349-51*. Prior to Gross, courts borrowed the mixed motive formulation from Title VII, and a plaintiff could carry her burden of proof under the ADEA by showing that age was *one* of the factors that motivated the adverse employment action. See *Gorzynski, 596 F.3d at 106*. After Gross, however, [*15] such a showing is insufficient. In order to carry her burden of proof in the last McDonnell Douglas step and survive summary judgment, plaintiff must now have sufficient evidence to convince a reasonable jury that age was "the 'but-for' cause" of her termination. Id.; *Gross, 129 S. Ct. at 2352*.

1. Prima Facie Case

In order to establish a prima facie case of age discrimination, Paolercio must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred

under circumstances giving rise to an inference of discrimination. *Gorzynski, 596 F.3d at 107*. Here, Defendants do not dispute that Paolercio was within the protected class, or that her termination constituted adverse employment action. (See Def. SJ Mot. at 15.)

As to the second prong, that she was qualified for the position, Paolercio has failed to meet her burden. In order to show that she was "qualified," Paolercio must show that her job performance was satisfactory "at the time of [her] discharge." *Thornley v. Penton Publishing, 104 F.3d 26, 29 (2d Cir. 1997)*. Although it is clear from the record that Paolercio's [*16] job performance was satisfactory at earlier points in her employment, her performance declined sharply in the years leading up to her termination. This latter part of Paolercio's employment is the relevant timeframe for assessing her job performance, and Paolercio concedes that her performance fell below Allstate's standards during this time. Paolercio's contention that the court should consider whether her substandard performance was *so substandard* as to warrant termination is unavailing. "Whether job performance was satisfactory depends on the employer's criteria for the performance of the job--not the standards that may seem reasonable to the jury or judge." *Thornley, 104 F.3d at 29*. Because Paolercio acknowledges that she did not meet her employer's job performance criteria at the time of her discharge, it is not the court's place to inquire into the reasonableness of this criteria.[4]

> 4 Although in-depth analysis of Allstate's criteria for evaluating the performance of no fault adjusters would be inappropriate here, the court notes that, on its face, neither Allstate's stated policies or its evaluation of Paolercio's performance appear unreasonable.

Paolercio has also failed to establish [*17] the fourth prong, that the adverse employment action against her occurred under circumstances giving rise to an inference of discrimination. Paolercio concedes that no one at Allstate made negative age-based remarks to her (Pl. Dep. 26:11-28:5), and that she has no "documentation" of discriminatory actions or any of what she calls "smoking gun evidence" (Pl. Opp. at 4). Paolercio's argument that she was held to a different standard that other employees is wholly conclusory and unsupported by the record. *Gorzynski, 596 F.3d at 101* ("[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some

metaphysical doubt as to the material facts.") (internal quotations and citations omitted). Here, the only "facts" to which Paolercio points are her subjective feelings that she faced discrimination. (See Pl. R. 56.1 Statement at 4-5.) Citing to her deposition testimony, Paolercio states, inter alia, that she "felt discriminated against before her termination," she "felt targeted before her termination," she "felt targeted from as early as March 2006," and she "felt that Allstate held her to a different standard." (Id.) Although supported [*18] by Paolercio's testimony, these feelings of discrimination do not amount to evidence that the court can credit. See *Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999)* (Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination") (punctuation omitted); *Martin v. MTA Bridges & Tunnels, 610 F.Supp.2d 238, 251 (S.D.N. Y. 2009)* (plaintiff's "belief" that an action was motivated by discrimination is not sufficient to raise a genuine issue of fact).

Although a plaintiffs burden in making a prima facie case is "not a heavy one," *Gorzynski, 596 F.3d at 107*, Paolercio has not satisfied even this meager burden with regard to the second and fourth elements.

2. Plaintiff's Burden of Establishing Pretext

Even if the court were to assume arguendo that Paolercio made a prima facie case, because Defendant has proffered a neutral justification for Plaintiff's termination--that Paolercio failed to meet the Allstate's requirements and regulatory standards--the burden would shift back to the Paolercio "to prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." [*19] *Gross, 129 S. Ct. at 2351*. Even viewing the evidence in the light most favorable to Paolercio, she has made no showing that age was *a* factor in her termination, let alone that it was the but-for cause. Furthermore, Paolercio has wholly failed to meet her burden of showing that there is a material issue of fact as to whether "the employer's asserted reason for discharge is false or unworthy of belief." See *Schnabel v. Abramson, 232 F.3d 83, 88-89 (2d Cir. 2000)*. On this record, no rational jury could find that Paolercio has carried her burden.

**B. Disparate Impact**[5]

   5   Although Paolercio's complaint alleges both

disparate treatment and disparate impact claims (Compl.), neither party makes any argument regarding her disparate impact claim in their submissions regarding summary judgment (see Def. SJ Mot; Pl. Opp.; Def. Reply (Docket Entry # 32)).

To establish a prima facie case of disparate treatment under the ADEA, a plaintiff must "first identify a specific employment practice having an adverse impact upon members of the protected class, and then show causation, i.e., that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." *Maresco v. Evans Chemetics. Div. of W.R. Grace & Co., 964 F.2d 106, 115 (2d Cir. 1992)* [*20] (internal quotation marks and citations omitted). A plaintiff can make such a showing by "showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination." *Waisome v. Port Auth. of N.Y. & N.J., 948 F.2d 1370,1375 (2d Cir.1991)*.[6] Moreover, a disparate impact claim "must allege a disparate impact on the entire protected group, i.e., workers aged 40 and over." *Criley v. Delta Air Lines. Inc., 119 F.3d 102, 105 (2d Cir. 1997)*.

   6   If a plaintiff makes a prima facie case of disparate impact, the parties move forward in the burden-shifting framework for analyzing this type of claim: "An employer may then show that the challenged practice had a legitimate purpose. If the employer meets this burden, the plaintiff must prove that the proffered purpose is pretextual." *Dist. Council 37 v. N.Y. City Dep't of Parks & Rec., 113 F.3d 347, 352 (2d Cir. 1997)* (internal citations omitted). Here, however, Paolercio has clearly failed to make a prima facie case of discrimination, and consideration of these additional steps is unnecessary.

Here, Paolercio has provided no statistical [*21] evidence of discrimination. The only evidence she provides that purports to relate to her disparate impact claim is her deposition testimony that several older employees in other Allstate departments stepped down or were terminated. Even accepting these allegations as true, the court is unable to draw any conclusion as to the statistical significance of a small number of terminations, as Paolercio has presented no evidence regarding how many workers there were in the entire protected group. Putting aside that the court finds extremely dubious the

suggestion that the termination of less than half a dozen employees at a large employer such as Allstate would have a statistically significant effect that implicates the entire group of Allstate employees in the protected group, the court cannot make any determination regarding disparate impact in the absence of statistical evidence. Furthermore, Paolercio has failed to "isolate[] and identify[] the *specific* employment practices that are allegedly responsible for any observed statistical disparities." See *Smith v. City of Jackson, Miss., 544 U.S. 228, 241, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005)*. In the absence of such a claim and in the absence of statistical evidence, no [*22] rational jury could find disparate impact based on age. Accordingly, defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2011

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge



**CHARLES MARTIN, Plaintiff, -v- CREATIVE MANAGEMENT GROUP, INC., CMG HOLDINGS, INC., ALAN MORELL, MICHAEL VANDETTY, and JIM ENNIS, Defendants.**

**10 Civ. 2214 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2010 U.S. Dist. LEXIS 66092*

**June 29, 2010, Decided**
**June 29, 2010, Filed**

**COUNSEL:** [*1] For Plaintiff: Jon D. Jekielek, Meyerowitz Jekielek PLLC, New York, NY.

For Defendants: Steven M. Rosen, Law Offices of Steven M. Rosen, Miami, FL.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION & ORDER*

DENISE COTE, District Judge:

Plaintiff Charles Martin ("plaintiff") has filed suit alleging breach of his employment contract with defendant Creative Management Group, Inc. ("CMG"). CMG, along with co-defendants CMG Holdings, Inc. ("CMG Holdings"), Alan Morell ("Morell"), Michael Vandetty ("Vandetty") and Jim Ennis (collectively, the "defendants") move to dismiss the complaint for improper venue or, alternatively, to transfer this case to the Southern District of Florida. For the reasons stated below, the motion to dismiss is granted.

*BACKGROUND*

The defendants are involved in the business of talent and event management. On or around October 1, 2006, the plaintiff entered into a two-year employment contract with CMG (the "Agreement"). Plaintiff alleges that, both before and after the execution of the Agreement, Morell and Vandetty made numerous oral misrepresentations regarding plaintiff's job responsibilities and compensation. Plaintiff further alleges that defendants wrongfully [*2] ended their relationship with the plaintiff, breached the Agreement by failing to pay the plaintiff, and have improperly squeezed the plaintiff out of a valuable ownership interest in CMG and CMG Holdings.

On March 15, 2010 the plaintiff filed a complaint (the "Complaint") in New York seeking compensatory and punitive damages for breach of contract, promissory estoppel, unjust enrichment, fraudulent inducement, violations of New York labor laws, and conversion. On April 30, defendants moved to dismiss the Complaint for improper venue, and, alternatively, to transfer the case to Florida. Plaintiff filed his opposition on May 21, and the defendants filed a reply on May 27.

*DISCUSSION*

Defendants move to dismiss the Complaint on the basis that the Agreement upon which plaintiff sues contains a mandatory forum selection clause. The Agreement specifies that "the Courts of the State of Florida shall have exclusive jurisdiction over the parties and subject matter of this agreement and that venue of any proceeding to enforce or interpret this agreement shall lie with the County, Circuit or other courts of Miami-Dade County, Florida."

"[W]here parties contract to a so-called mandatory forum selection [*3] clause, in which they agree in advance on a forum that is exclusive of all others, the choice of forum is accorded [a] presumption of enforceability." *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009).

In general, to obtain dismissal based on a forum selection clause the party seeking enforcement of the clause must demonstrate that: (1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause.

*Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 89 (2d Cir. 2009). "After the party seeking enforcement has established these three conditions, the burden shifts to the party resisting enforcement to rebut the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* (citation omitted).

The defendants have carried their burden as to the first three prongs. First, the defendants have demonstrated that the forum selection [*4] clause was reasonably communicated to the plaintiff. The plaintiff admits that he "fully negotiated" and executed the Agreement himself in New York. The forum selection clause was located on the signature page, in the same size type as the rest of the Agreement. These facts reflect notice well beyond that required by established precedent. *Cf. Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10-11 (2d Cir. 1995) (finding reasonable notice where the "fine print" forum selection clause was printed on a

nonnegotiable cruise line ticket). Plaintiff's argument that he "was not represented by an attorney in the negotiation or drafting" of the Agreement and "had no idea what the venue provision would have meant" if a dispute arose does not demonstrate that the forum selection clause was not communicated to him. Moreover, "a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms." *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000) (citation omitted).

It is also clear that the Agreement's forum selection clause is mandatory and not permissive. "A forum selection clause is viewed as mandatory when [*5] it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 386 (2d Cir. 2007). The Agreement unambiguously states that "the State of Florida *shall* have *exclusive* jurisdiction" and "that venue of any proceeding to enforce or interpret this agreement *shall* lie with the County, Circuit or other courts of Miami-Dade County, Florida" (emphasis added).

Finally, the claims and parties involved in this suit are subject to the forum selection clause. "[W]hen ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels." *Id.* at 388. Each of plaintiff's claims -- breach of contract, promissory estoppel, unjust enrichment, fraudulent inducement, New York labor law violations, and conversion -- arises from the plaintiff's relationship with the defendants, as governed by the Agreement. Thus, all of plaintiff's claims are fairly classified as part of the "subject matter" of the Agreement and, therefore, are subject to the forum selection clause. [1]

    1   Plaintiff does not oppose defendants' motion on the basis that not all defendants [*6] were signatories to the Agreement.

Because all three initial conditions are satisfied, the forum selection clause is presumptively enforceable, and shall be given effect "unless (1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum state; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court." *Id.* at 392. Here, as in *Phillips*, the plaintiff "does not contend that the first

three circumstances are present." *Id.* His argument, under the fourth factor, is that few, if any, of his witnesses or documents are located in Florida, rendering litigation in that state impossible.

Plaintiff's argument fails because he has shown only that litigation in Florida "may be more costly or difficult, but not that it is impossible." *Id. at 393.* The plaintiff has not alleged any circumstances "that would prevent him" from bringing suit in Florida. *Id.; see also Effron, 67 F.3d at 10-11* (explaining that the distance between Greece and the United States did not render the forum inconvenient [*7] because Greece was readily accessible by air travel). Because the plaintiff has failed to rebut the presumption of enforceability, the mandatory forum selection clause will be enforced.

*CONCLUSION*

Defendants' April 30, 2010 motion to dismiss is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York

June 29, 2010

/s/ Denise Cote

DENISE COTE

United States District Judge



**TRILEGIANT CORPORATION, Plaintiff, -v- SITEL CORPORATION, Defendant.**

**09 Civ. 6492 (KBF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2013 U.S. Dist. LEXIS 72828*

**May 20, 2013, Decided**
**May 20, 2013, Filed**

**PRIOR HISTORY:** *Trilegiant Corp. v. Sitel Corp., 2012 U.S. Dist. LEXIS 129546 (S.D.N.Y., Aug. 27, 2012)*

**COUNSEL:** [*1] For Trilegiant Corporation, Plaintiff: Bernard J. Garbutt, III, Morgan, Lewis and Bockius LLP (NY), New York, NY; Jayesh Santkumar Hines-Shah, PRO HAC VICE, Morgan Lewis & Bockius, LLP (IL), Chicago, IL; Kenneth Michael Kliebard, PRO HAC VICE, Morgan, Lewis & Bockius LLP (Chicago), Chicago, IL.

For Sitel Corporation, Defendant: Andrew John Wells, LEAD ATTORNEY, Phillips Lytle LLP (Madison Ave.), New York, NY; Douglas William Langdon, Gene F. Price, Justin Soper Fowles, PRO HAC VICE, Frost Brown Todd LLC, Louisville, KY; John G. Schmidt, Phillips Lytle LLP (Buffalo, NY), Buffalo, NY.

For Sitel Corporation, Counter Claimant: Andrew John Wells, LEAD ATTORNEY, Phillips Lytle LLP (Madison Ave.), New York, NY; Douglas William Langdon, Gene F. Price, LEAD ATTORNEYS, PRO HAC VICE, Frost Brown Todd LLC, Louisville, KY; John G. Schmidt, Phillips Lytle LLP (Buffalo, NY), Buffalo, NY.

For Trilegiant Corporation: Counter Defendant: Bernard J. Garbutt, III, Morgan, Lewis and Bockius LLP (NY), New York, NY; Jayesh Santkumar Hines-Shah, PRO HAC VICE, Morgan Lewis & Bockius, LLP (IL), Chicago, IL; Kenneth Michael Kliebard, PRO HAC

VICE, Morgan, Lewis & Bockius LLP (Chicago), Chicago, IL.

**JUDGES:** KATHERINE B. FORREST, [*2] United States District Judge.

**OPINION BY:** KATHERINE B. FORREST

**OPINION**

MEMORANDUM DECISION & ORDER

KATHERINE B. FORREST, District Judge:

This diversity breach of contract action was filed in July 2009, and was presided over by the Honorable Barbara S. Jones, formerly of this Court.[1] After a lengthy period of discovery, on October 15, 2012, cross-motions for summary judgment were filed. (ECF Nos. 106, 112.) On October 29, 2012, defendant Sitel Corporation ("Sitel") also moved to strike the declaration of counsel for Trilegiant Corporation ("Trilegiant"), Kenneth M. Kliebard in Support of Plaintiff's Motion for Summary Judgment. (ECF Nos. 115, 119.) This matter was subsequently transferred to the undersigned. (ECF No. 149.)

    1 Just prior to the close of discovery, defendant served an amended answer and counterclaim

Case 2:12-cv-01718-LDW-ARL   Document 83   Filed 06/12/13   Page 28 of 35 PageID #: 3053

Page 2
2013 U.S. Dist. LEXIS 72828, *2

(asserting claims for breach of contract and unjust enrichment) on September 12, 2012. (ECF No. 103.)

For the reasons set forth below, plaintiff's motion for summary judgment is denied in its entirety. Defendant's motion for summary judgment is granted in its entirety, and judgment is entered for defendant in the amount of $1,201,915.39.

I. BACKGROUND

The facts set forth below are undisputed unless otherwise [*3] noted.

A. The Relevant Contracts

Trilegiant operates membership-based service clubs and programs. Defendant Sitel operates call centers at a number of locations worldwide.

On September 12, 2005, Trilegiant and Sitel, through Sitel's predecessor-in-interest, ClientLogic Operating Corporation ("ClientLogic") entered into a Call Center Services Agreement ("CSA"). The CSA provides that the "Vendor" (ClientLogic, and later Sitel) would provide services as set forth in a Statement of Work ("SOW"). (Decl. of Andrew J. Wells in Support of Sitel's Motion for Summary Judgment ("Wells Decl."), Ex. 4, § 1.1.) The CSA states that "[i]n the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Statement of Work, the terms and conditions of this Agreement [the CSA] shall prevail." (Id.)

Section 4.6 of the CSA sets forth various provisions limiting liability. This is the sole section of the CSA presented entirely in capital letters. As relevant to this action, it states:

> (b)(i)  EXCEPT FOR CLAIMS ARISING OUT OF OR RELATING TO . . . (III) THE FRAUDULENT, GROSSLY NEGLIGENT OR WILFULL MISCONDUCT OF VENDOR, VENDOR'S LIABILITY UNDER THIS AGREEMENT OR ANY SCHEDULE, [*4] REGARDLESS OF FORM OF THE ACTION, SHALL NOT EXCEED THE GREATER OF (A) THE AMOUNT PAID FOR THE SERVICES FOR THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE EVENT GIVING RISE TO THE LIABILITY OCCURRED OR (II) TEN MILLION DOLLARS.

And

> (ii) EXCEPT FOR CLAIMS ARISING OUT OF OR RELATING TO . . . (III) THE FRAUDULENT, GROSSLY NEGLIGENT OR WILFULL MISCONDUCT OF VENDOR, VENDOR SHALL NOT BE LIABLE FOR (A) INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, WHETHER BASED IN CONTRACT, TORT, STATUTE OR OTHERWISE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES . . . . THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY AND VOLUNTARILY.

(Id., § 4.6(b).)

On September 13, 2005, Trilegiant and ClientLogic entered into the first SOW for ClientLogic's location in Manila, the Philippines. (Declaration of Mickie Baker in Support of Sitel's Motion for Summary Judgment ("Baker Decl."), Ex. 8, at Bates Sitel 000119.)

On September 28, 2006, ClientLogic and Trilegiant entered into a second SOW for ClientLogic's Manila call center (the "2006 Manila SOW"). That SOW states that in the "event of any express conflict or inconsistency [*5] between the provisions of this SOW and the provisions of the Agreement [the CSA], the provisions of this SOW shall control." (Baker Decl., Ex. 2, at Bates Sitel 000079.) Section 3(d) of the 2006 Manila SOW required that ClientLogic, and later Sitel "transfer digital recordings of a portion of the calls to HyperQuality via FTP." (Id at Bates Sitel 000080.) The SOW is signed by Julie Casteel as Chief Sales & Marketing Officer for ClientLogic. (Id. at Bates Sitel 000083.)

The requirements for call recording, transfer of such

recordings and retention are set forth in a document attached as Exhibit D to the 2006 Manila SOW entitled "Information Technology Statement of Work" [the "IT SOW"]. (Id. at Bates Sitel 000088) That document is prefaced with a single page which states, "Both parties have agreed that the attached Application Scope of Work fully displays the requirements from Trilegiant." (Id.) The IT SOW states:

> **Agent Application**   A contact center application will provide the agent with scripting information and will capture call and transaction data related to the Transfer Plus business. The application will be constructed based on several documents received from the client and conference [*6] call discovery sessions to be conducted.

(Id. at Bates Sitel 019685.)

The document also states:

> **HyperQuality Process**   Call recording will occur in the Philippines. These recordings, along with data captured by the agent application, will be periodically extracted and submitted to . . . HyperQuality for quality review.

(Id.) It further states that "[d]uring the course of the sale, customer information will be collected for transmitting via the DE3 (Add) file." (Id. at Bates Sitel 019691.) And: "ClientLogic will be responsible for producing the [DE3 file] for the client as per the specifications provided by the client and agreed to over conference call meetings . . . ." (Id, at Bates Sitel 019695.) Finally, in a section headed "Call Tracking" it states that, "to handle all reporting needs, the following information will be recorded on each call: . . . For each sale made, all information for the DE3 and TMV files will be saved." (Id. at Bates Sitel 019692.)

The IT SOW contains a schematic which sets forth the process of call intake through call recording. The schematic shows a call coming into the customer service center and eventually being routed into the DE3 (Add) File and into the FTP server. [*7] (Id. at Bates Sitel

019697.) Under a "Voice Solution" section, the document states that "[b]oth the voice and data files will be encrypted, zipped and placed at the FTP site for delivery to HyperQuality." (Id. at Bates Sitel 019698.) Finally, the document has a section entitled "Constraints/Assumptions" which states that "FTP Server Voice file Storage retention period is 90 days." (Id. (emphasis added).)

The 2006 Manila SOW also states that "Vendor [ClientLogic, and later Sitel] will fully comply with Trilegiant's Vendor Standards Manual ["VSR"] which Vendor is in receipt of." (Id. at Bates Sitel 000079.) No document called a "Vendor Service Manual" is attached to the CSA, the original SOW, or the 2006 Manila SOW. With the exception of the 2009 version of the SOW (as to which there is no evidence in the record before the Court that Sitel ever received), none of the VSRs have a cover page or title page that denominates it specifically as a "VSR." With that said, in a declaration, Sitel's senior vice president for operations, Mickie Baker states that the documents included in Exhibit 5 of his declaration are "VSRs" received by Sitel. (Baker Decl. ¶ 15.) Trilegiant's submissions on these [*8] motions also attach various versions of the VSRs.

The relevant issues before the Court relate to provisions of the versions of the VSRs demonstrated to have been in Sitel's possession. Each of these versions contains a page for the recipient to have various responsible members of the call center sign, acknowledging receipt and review. (See e.g., Baker Decl. Ex. 5, at Bates Sitel 000243.) There is no signed page for any version of the VSR in the record; Baker's declaration states that "none of these documents is specifically entitled "Vendor Services Manual" and none are signed. And none were attached to the Manila Inbound Transfer Program SOW" [the 2006 Manila SOW, discussed supra]. (Baker Decl. ¶ 14.)

Each of the four (or, as explained infra possibly five) versions of the VSR--for which the record contains evidence of Sitel's possession--contains the following statement: "This Vendor Manual is intended as a supplement to individual Vendor agreements. Any conflicts or ambiguity between this Manual and any relevant Vendor agreement shall be construed in favor of the Vendor agreement." (See e.g., Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435.)[2]

2   There is an additional [*9] VSR in Exhibit 5

to the Baker Declaration with the same language, although the Bates number is cut off in the scan submitted to the Court. The Bates number begins: "Sitel 0193 . . ." The language is contained on page "10of59" in the document.

Each of the versions of the VSR that were in Sitel's possession has pages with dates from 2004. The first version bears the notation at the bottom "2004 OB Standards Manual, Revised 1/12/04". (See id. at Bates Sitel 000245.) Under a provision for "Record Keeping Standards," the VSR requires that oral verifications of enrollment should be maintained for thirty-six months. (Id. at Bates Sitel 000247.) It also states that "[t]hese record-keeping requirements may be split between Trilegiant and each Vendor in accordance with the Vendor Agreement." (Id.) This version also contains a separate provision later in the document entitled "Verification Standards" which provides that "Trilegiant Corporation requires **all Vendors to conduct 100% taped confirmation of sales** . . . . Vendors **must maintain verification voice tapes/CD's for a minimum of 48 months** . . . . Failure to produce proof of enrollment recording will result in a $250.00 fine per incident." [*10] (Id. at Bates Sitel 000269 (emphasis in original).)

The second version of the VSR is included as an attachment to an email titled "Trilegiant 2005 Standards Manual rev 5.11.05.doc" (the email is dated in May 2006). (Id. at Bates Sitel 002150.) The email states: "Attached are the files that the [sic] are needed for the Manila transfer plus program. We can go over these next week." (Id.) Despite the attachment being dated in 2005, at the bottom of each page on the document is the notation "2004 OB Standards Manual Revised 1/12/04." (See id. at Bates Sitel 002150-Bates Sitel 002207.) This version includes the same language as the first version referred to above.

The third VSR version maintained in Sitel's files shows track changes and appears to be a draft--at the back of the document the date of September 6, 2006, is associated with the track changes. (Id. at Bates Sitel 019485.) At the bottom of each page on the document is the notation "2004Standards Manual Revised 1/12/04." (See id. at Bates Sitel 019426-Bates Sitel 19484.) This version includes the same language as the prior two versions with respect to record keeping and that ambiguities should be resolved in favor of the "Vendor [*11] agreement"; and that the "requirements may be split

between Trilegiant and each Vendor in accordance with the Vendor agreement;" and that failure to retain tapes would result in a $250.00-per-incident fine; but that retention of tapes should be for thirty-six months (instead of forty-eight months). (See id. at Bates Sitel 019435, Bates Sitel 019437, Bates Sitel 019460.)

The fourth and/or fifth versions of the VSR manual contain Bates numbers the scans of which are cut off-they begin with "Sitel 01936 . . ."--and accordingly the Court here refers to them by their page numbers, which read as "1of59," "2of59," etc, through page seventeen, and afterwards are noted only with page numbers "18," "19," etc. The document is prefaced with an email dated August 25, 2006, with the subject line "VENDOR STANDARDS" and an attachment titled "Standards Manual 2004 rev 5 11 05.doc". This/these version(s) contains the same language as the prior versions regarding record keeping; however, in the "Verification Standards" section, the retention period is stated as forty-eight months again. (Id. at 35.) The bottom of each page from "1of59" through "17of59" bears the notation "2004Standards Manual Revised [*12] 1/12/04"; at the bottom of each of the following pages are the notations "2004 Standards Manual Revised 1/12/04." That is, starting on page eighteen, there is a space between "2004" and "Standards"; in addition, the placing of the notation "Revised 1/12/04" is different after page eighteen.

It is undisputed, and is indisputable, that each of the VSRs state: "Any conflicts or ambiguity between this Manual and any relevant Vendor agreement shall be construed in favor of the Vendor agreement." (See e.g., Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435; see also supra, note 2.) Moreover, it is undisputed, and is indisputable, that the CSA required Sitel to "provide the services described in the Statement of Work." (Wells Decl. Ex. 4 § 1.1.) Finally, it is undisputed, and is indisputable, that the "requirements from Trilegiant" under the 2006 Manila SOW, and the IT SOW attached thereto, required retention of recordings for ninety days. (See Baker Decl. Ex. 2 at Bates Sitel 000088, Bates Sitel 019698.)

B. The Conduct at Issue

On November 30, 2007, one Andrea Whitney of Sitel emailed several individuals at Trilegiant that because Sitel had been using "the previous Affinion [*13] Loyalty Verint system and rules, all calls are

purged from the system after 90 days." (Baker Decl. Ex. 3 at Bates Sitel 014722.) Whitney further stated that Sitel had "put in place today the archiving process and will keep all recordings for 36 months." (Id.)

On January 3, 2008, on behalf of Trilegiant, one Vilma Viola wrote ClientLogic's "General Counsel-North America" that "[p]ursuant to the tape retention requirements set forth in the Vendor Standards Manual, which is incorporated by reference in the SOW, Trilegiant is hereby requesting Vendor to provide all proof of enrollment recordings commencing on the SOW Date and concluding on September 1, 2007." (Baker Decl. Ex. 4 at Bates Sitel 019365.) ClientLogic/Sitel was unable to comply with this request in light of their previously stated retention arrangement.

In this action, Trilegiant seeks damages pursuant to the "fine" provision contained in the VSRs in an amount in excess of $33 million, for Sitel's failure to maintain the recordings for forty-eight months, as opposed to ninety days. Trilegiant, in other words, alleges that Sitel's failure to retain the recordings for more than ninety days was a breach of contract. Sitel has counterclaimed [*14] for call center work it alleges it performed pursuant to the SOWs in the amount of $1,201,815.39 for which it has invoiced Trilegiant and not been paid. (See Baker Decl. ¶¶ 32-33.)

The parties do not dispute that prior to November 30, 2007, ClientLogic/Sitel did not retain enrollment verification recordings for a period longer than ninety days. On July 30, 2008, Trilegiant notified Sitel that it was terminating the CSA.

## II. LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010)*.

Once the moving party has asserted facts showing that the non-movant's [*15] claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011)*; see also *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citations omitted); see also *Price, 808 F. Supp. 2d at 685* ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial."). In addition, self-serving affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See *BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996)*. Only disputes relating to [*16] material facts--i.e., "facts that might affect the outcome of the suit under the governing law"--will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; see also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. RELEVANT PRINCIPLES OF CONTRACT LAW

### A. Contracts Construed According to Plain Language

It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737 (2d Cir. 1999)* (quotation marks omitted), when the agreements are "read as a whole." *W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440, 443 (N.Y. 1990)*. Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions." *Katel Ltd. Liab. Co. v. AT&T Corp., 607 F.3d 60, 64 (2d Cir. 2010)*

(quotation marks omitted). Courts must avoid [*17] "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, *337 F.3d 237, 250 (2d Cir. 2003)*. When the parties' intent is clear--i.e., unambiguous-- the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, *639 F.3d 63, 69 (2d Cir. 2011)* (citing *South Rd. Assocs., LLC v. IBM, 4 N.Y.3d 272, 826 N.E.2d 806, 809, 793 N.Y.S.2d 835 (N.Y. 2005))*. A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." Id. (citing *White v. Cont'l Cas. Co., 9 N.Y.3d 264, 878 N.E.2d 1019, 1021, 848 N.Y.S.2d 603 (N.Y. 2007))*.

If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. See *Lockheed Martin Corp., 639 F.3d at 69* (contractual language is ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The court must then turn to extrinsic evidence to determine the parties' intent. *State of New York v. Home Indem. Co., 66 N.Y.2d 669, 486 N.E.2d 827, 829, 495 N.Y.S.2d 969 (N.Y. 1985)* (per curium). While extrinsic evidence [*18] generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. *Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008)*.

Contract disputes are generally resolvable on summary judgment only when the contractual language in question is wholly unambiguous. *Id. at 68*. However, the court may grant summary judgment if ambiguities exist and if those ambiguities "may be resolved through extrinsic evidence that is itself capable of only one interpretation." Id. In addition, the court may interpret ambiguous term and grant summary judgment "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the [ambiguous] language." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 158 (2d Cir. 2000)*.

The Second Circuit has reminded us of the common-law rule that a court should construe ambiguous language of a contract against the drafter--so as to protect the non-drafter from an unintended or unfair result. See

*Paine Webber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996)*.

B. Liquidated [*19] Damages versus Fines

Under New York law, penalty provisions masquerading as liquidated damages are unenforceable as a matter of law. However, courts will enforce liquidated damages provisions where actual damages are difficult to ascertain or the sum stipulated is not proportionate to the loss. See *U.S. Fidelity and Guar. Co. v. Braspetro Oil Svcs. Co., 369 F.3d 34, 70 (2d Cir. 2004)* (citing *United Merchants & Mfrs. v. Equitable Life Assurance Soc'y. 674 F.2d 134, 142 (2d Cir. 1982)*.

A sustainable liquidated damages provision is one negotiated between the parties in which they anticipate a reasonable amount payable for actual loss in the event of a breach. *Id. at 71* (citations omitted). Courts will not uphold such provisions if the specified amount is not a reasonable measure of the anticipated harm. Id. (citing *BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 396, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999)*). If a purported liquidated damages provision is plainly disproportionate to the contemplated injury, the amount will be disallowed. Id.; see also *Fingerlakes Aquaculture, LLC v. Progas Welding Supply, Inc., 34 A.D.3d 1070, 825 N.Y.S.2d 559, 560 (3d Dep't 2006)* ($400 per day "fine" for non-delivery of a tank constituted an unenforceable penalty, [*20] where the non-delivery would result in an insignificant financial loss and the imposition of the fine "would constitute a windfall well above the actual harm sustained"). Similarly, a "liquidated damages" provision that is intended to compel contractual performance rather than to compensate for loss in the event of a breach is unenforceable as a penalty provision. See *Rattigan v. Commodore International, 739 F. Supp. 167, 169 (S.D.N.Y. 1990)*.

Determining whether a provision constitutes true liquidated damages or is, in fact and effect, a penalty, is a question of law. *Braspetro. 369 F.3d at 71*. "Under no circumstances, however, will liquidated damages be allowed where the contractual language and attendant circumstances show that the contract provides for the full recovery of actual damages, because liquidated damages and actual damages are mutually exclusive remedies under New York law." Id.

Determining whether a contractual provision is in the nature of liquidated damages--or is a penalty--requires

that the Court look to the anticipated loss discernible at the time of the contracting and not actual loss incurred. See *Vernitron Corp. v. CF 48 Assocs., 104 A.D.2d 409, 409, 478 N.Y.S.2d 933 (2d Dep't 1984).* [*21] Courts should seek to determine whether a liquidated damages provision is reasonable--and whether in the absence of such a provision, damages are difficult to calculate. Id.

## IV. STANDARD FOR GROSS NEGLIGENCE

Under New York law, gross negligence is conduct that "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd., v. Jewlers Protection Services, 81 N.Y.2d 821, 823-24, 611 N.E.2d 282, 595 N.Y.S.2d 381 (N.Y. 1993).* Ordinary mistakes in performance do not constitute "gross negligence." See *Industrial Risk Insurers v. Port Authority of New York and New Jersey, 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005).*

## V. DISCUSSION

### A. Which Retention Period Governs?

Every version of the VSR which the record evidence demonstrates was in Sitel's possession contains a clear contractual provision providing that in the event of any conflict, the "Vendor agreement" governs. (See e.g., Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435; see also supra, note 2.) The relevant "Vendor agreement"--the CSA--refers, in turn, to the SOW between the parties. The 2006 Manila SOW states that in the "event of any express conflict or inconsistency between the provisions of this SOW [*22] and the provisions of the Agreement [the CSA], the provisions of this SOW shall control." (Baker Decl. Ex. 2 at A-3.) And the 2006 Manila SOW's attached IT SOW provides for a ninety-day retention period. (See Baker Decl. Ex. 2 at Bates Sitel 000088, Bates Sitel 019698.)

Section 3(d) of the 2006 Manila SOW states that "Vendor will transfer digital recordings of a portion of the calls to HyperQuality via FTP." (Id., at B-2.) That statement is contained in the text of the SOW, and nothing about that statement suggests that it is a temporary obligation. ClientLogic/Sitel's recording and retention obligations are fully set forth in the IT SOW, attached to the 2006 Manila SOW--indeed, that document is prefaced with a single page which states: "Both parties have agreed that the attached Application Scope of Work fully displays the requirements from Trilegiant." (Id. at

Bates Sitel 000088.) This language--in contrast to that in the VSRs--indicates that the parties have agreed to its terms and "fully displays the requirements from Trilegiant." As stated supra, that "requirement[s] from Trilegiant" was to retain recordings for ninety days. (Id. at Bates Sitel 019698.)

Thus the plain and unambiguous [*23] language of the CSA, the 2006 Manila SOW, and the IT SOW required that Sitel retain call recordings on the FTP for ninety days. There is simply no other reading of these documents providing for a longer retention period requirement. Accordingly, Sitel did not breach the CSA or any of its incorporated documents when it failed to retain recordings for longer than ninety days--that was the only period for which it was required to do so.

In addition, the Court notes that the VSRs were not negotiated between the parties, nor were they ever signed by Sitel, ClientLogic, or Trilegiant. (See e.g., Baker Decl. Ex. 5 at Bates Sitel 000243.) They were also inconsistent in terms of retention--internally, and with the CSA and the SOWs. On the one hand, each version provided for "Record Keeping Standards" that required that oral verifications of enrollment should be maintained for thirty-six months. (See e.g., id. at Bates Sitel 000247.) But they also stated that "[t]hese record-keeping requirements may be split between Trilegiant and each Vendor in accordance with the Vendor Agreement." (Id.) Moreover, they contained a later provision regarding "Verification Standards" providing for retention of [*24] recordings for a minimum of thirty-six or forty-eight months (depending on the VSR). (See e.g., id. at Bates Sitel 000269.)

The laws of contract construction require that the Court credit the provision of the VSRs which sends the reader back to the CSA, and from thence to the 2006 Manila SOW and the incorporated IT SOW. To the extent there is a difference in retention period between the IT SOW and the VSRs, the IT SOW must govern according to the path established by the contractual documents themselves.

### B. Gross Negligence

The Court has determined that the ninety day retention period applies in this matter, and that therefore Sitel was not in breach of any agreement by failing to retain recordings for any longer period of time. However, even if the Court were to have found that the thirty-six or

forty-eight month retention periods set forth in the VSRs were applicable, any recovery would nevertheless be limited by the limitations on liability provision of the CSA. Section 4.6 of the CSA limits liability to $10 million--except in instances of gross negligence. There is simply no triable issue of fact as to whether defendant acted with gross negligence. As discussed above, the legal standard [*25] for gross negligence requires conduct that evinces intentional wrongdoing or a reckless disregard for the rights of others. There is no evidence in the record of any such conduct.

C. Is the Fine Provision Applicable or Enforceable?

Having found that the CSA's section 4.6 limitation on liability applies does not entirely dispose of the question of whether damages would nonetheless be payable under the "fine" provision in the VSR if the Court had found Sitel in breach (and the Court has not so found). There remains an argument--which the Court finds to lack merit--that even if the CSA limitation of liability applies (and even if Sitel were in breach), Sitel should nonetheless pay up to $10 million of the "fine" amount.

The "fine" provision purporting to require $250 per "incident" of non-retention and/or non-recording is an unenforceable penalty under New York law. Indeed, it is specifically denominated a "fine"--and the Court gives the terms in a contract their plain and ordinary meaning. There is no ambiguity about the word "fine"--a fine is a penalty, not reasonable damages negotiated to compensate for compensable loss. Penalty provisions are not enforceable. See *Vernitron, 478 N.Y.S.2d at 934.*

Moreover, [*26] there is no evidence in the record that the "fine" was subject to any negotiation. Nor is there any evidence that any of the justifications for the amount of $250 "per incident" bear any relationship to any estimate of reasonable loss with regard to any purported failure of ClientLogic/Sitel to maintain recordings for thirty-six or forty-eight months. Much of the evidence put forward to support the $250 amount post dates the 2004 and/or 2005 dates of the VSRs in Sitel's files. In other words, the VSR language was in place before the 2006 Manila SOW here at issue was negotiated between the parties. There can also be no serious dispute that the provision relating to the "fine" was in the VSR one to two years before any VSR was even sent to Sitel. Thus, Trilegiant's arguments regarding calculation of potential loss in "2006" (see e.g., Trilegiant's Memorandum in

Opposition to Sitel['s] Motion for Summary Judgment, at 17) are irrelevant.[3]

3  Having found that there is no breach of contract, the Court finds it unnecessary to address the question of plaintiff's actual damages.

Trilegiant does submit a declaration from Kerry Gay, Vice President of Operations of Trilegiant on this issue. (See [*27] Declaration of Jayesh-Hines Shah in Support of Plaintiff['s] Motion for Summary Judgment, Ex. 1.) Gay concedes that "some time before 2006, I was responsible for setting the amount of liquidated damages at $250." (Id. ¶ 15.) This concession itself indicates that the provision was not negotiated in connection with the Trilegiant/ClientLogic 2006 Manila SOW. The explanation that Gay further provides indicates that she considered the importance of maintaining call recordings. (Id. ¶ 17.) The only reasonable inference the Court can draw from this statement is that the "fine" was designed to coerce performance--and hence act as a penalty for non-performance--not to arrive at some reasonable estimate of loss. See *Rattigan, 739 F. Supp. at 169.*[4] While Gay refers to using a "loss" amount of a two year revenue stream, she in no way ties actual failure to record calls to total loss of all calls. (Id. ¶ 19.) Put another way, the "fine" assumes that all calls which a vendor has failed to record result in a loss of two years of revenue. There is no basis proffered for such an assumption. Gay, for instance, does not refer to data suggesting that a certain percentage of non-recorded calls in fact [*28] result in lost revenue; and there is no reasonable basis to assume that all such non-recorded calls result in loss.

4  The declaration of Vilma Viola, also submitted by plaintiff, is similar. (See Shah Decl. Ex. 2;) In a section of the declaration entitled "Amount of Liquidated Damages", Viola states that "[b]anking and financial institution marketing partners rely on Trilegiant's maintenance of sales call recordings." (Id. ¶ 19.) She follows this statement by suggesting that "if" Trilegiant was unable to produce a recording, the partner "may ask" Trilegiant to stop billing the customer, resulting in the loss of revenue. (Id.) As an initial matter, the only reasonable inference from this statement is that the "fine" provision is intended to compel performance and penalize non-performance; it is also entirely hypothetical and speculative.

Trilegiant states that the SOW was negotiated;

however, there is no evidence in the record before the Court that the VSR was ever negotiated. That is, apart from the fact that the VSR is referred to in the SOW (but "which" VSR is unclear) there is no evidence that this provision was freely contracted into. This further undercuts the argument that the "fine" [*29] is in fact liquidated damages. Cf. *Rattigan, 739 F. Supp. at 170.* As set forth above, courts will enforce liquidated damages when they are negotiated between parties and bear some reasonable relationship to actual loss. See *U.S. Fidelity and Guar. Co., 369 F.3d at 70.* This is not the case here.

Finally, the Court is persuaded that in all events, in doubtful cases (and this is hardly that), Courts have tended to favor the construction that makes the sum payable a penalty rather than liquidated damages. *Rattigan, 739 F. Supp. at 170.*[5]

> 5    Defendant has also moved to strike the declaration of Kenneth M. Kliebard, submitted in support of plaintiff's motion. Defendant argues that Kliebard, who is counsel of record to plaintiff in this matter, is proferring this declaration as an undisclosed expert or fact witness--and that he cannot function in those capacities and also be counsel of record. Much of the "litigation" to which Kliebard refers occurred long after 2004 (the Court notes that ¶ 8 of the declaration refers to consent decrees dating back to the "early 2000s" and "in place at the time Trilegiant's contract with Sitel was negotiated", but Kliebard does not tie those decrees to specific [*30] intent of the parties with respect to the actual fine language in the VSR. Therefore, the Court finds that the declaration is irrelevant to the issue of the intent of the parties in this lawsuit. The motion to strike is therefore DENIED as moot.

## VI. SITEL'S REQUEST FOR PAYMENT

Having disposed of plaintiff's claim, the Court turns to defendant Sitel's counterclaim for amounts invoiced but remaining unpaid. Trilegiant argues that it need not pay amounts invoiced because Sitel had materially

breached the contract. (See Trilegiant Corp.'s Mem. in Opp'n to Sitel Operating Corp.'s Mot. for Summ. J. (ECF No. 132) at 24-25.) The Court has found that argument to be without merit-- Sitel did not breach any contract with Trilegiant. In fact, Sitel was performing according to the agreements of the parties, properly construed.

Trilegiant does not proffer evidence disputing the amount invoiced or the work otherwise performed. Accordingly, since Trilegiant had agreed to pay Sitel for work performed, and since work was performed, Trilegiant must now pay amounts owed.

The Court grants Sitel's motion for summary judgment in the amount requested, $1,201,815.39. Judgment is entered in that amount.

## VII. [*31] CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is DENIED and defendant's is GRANTED in its entirety. Trilegiant's claims are dismissed.

Moreover, it is ORDERED, ADJUDGED, AND DECREED that judgment be entered for Sitel in the amount of $1,201,815.39, as the Court has granted Sitel summary judgment on its counterclaim for that amount. Sitel is directed to submit a proposed form of judgment within five business days.

The Clerk of Court is directed to close the motions at ECF Nos. 106, 112, and 119.

SO ORDERED.

Dated: New York, New York

May 20, 2013

/s/ Katherine B. Forrest

KATHERINE B. FORREST

United States District Judge