UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JOSEPH ARENA, on behalf of himself
and all others similarly situated,

              Plaintiffs,

        -against-

DELUX TRANSPORTATION SERVICES, INC.,
LINCOLN HOLDING CORPORATION, WEBSTER
MANAGEMENT, WEBSTER MANAGEMENT, INC.,
WILLETS MANAGEMENT, INC., PORT
CONVEYANCE, DELUX TAXI OF LONG ISLAND,
DELUX LIMOUSINE SERVICE, BAY LIMOUSINE
AND ARROW ISLAND LIMOUSINE, INC., and any
other such related subsidiaries or affiliates of LINCOLN
HOLDING CORP., PETER BLASUCCI, an individual,
and ANDREA MAJER, an individual,

              Defendants.
----------------------------------------------------------X

__MEMORANDUM AND ORDER__

CV 12-1718

(Wexler, J.)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★  FEB 26 2014  ★

**LONG ISLAND OFFICE**

APPEARANCES:

Leeds Brown Law, P.C.
By: David H. Rosenberg, Esq.
    Jeffrey L. Brown, Esq.
    Bryan Arbeit, Esq.
1 Old Country Road
Carle Place, NY 11514
Attorneys for Plaintiffs

Schnader Harrison Segal & Lewis LLP
By: Theodore L. Hecht, Esq.
140 Broadway, Suite 3100
New York, NY 10005-1101
Attorney for Defendants

WEXLER, District Judge:

      Plaintiff brings this action claiming violations of the Fair Labor Standards Act ("FLSA"),

1

New York State Labor Law ("NYLL"), New York Code of Rules and Regulations ("NYCRR"), and for wrongful conversion of his funds.[1]  The gravamen of Plaintiff's complaint[2] is that as a driver of taxicabs, he was defendants' employee and therefore entitled to the protections of the FLSA and New York labor laws, which he claims were violated here.  Specifically, Plaintiff claims he was not paid minimum wage, proper overtime or his "spread of hours" pay.  Plaintiff also claims that his funds were wrongfully withheld and converted by defendants.

Defendants Delux Transportation Services, Inc. ("Delux"), Lincoln Holding Corporation, Webster Management, Webster Management, Inc., Willets Management, Inc., Port Conveyance, Delux Taxi of Long Island, Delux Limousine Service, Bay Limousine and Arrow Island Limousine, Inc., Peter Blasucci ("Blasucci"), and Andrea Majer ("Majer"), (collectively, the "Defendants") move for summary judgment pursuant to Federal Rules of Civil Procedure ("Fed.R.Civ.P."), Rule 56.  Defendants argue that Plaintiff was not an employee, thus precluding his FLSA and New York labor law claims, and even if he were an employee, the taxicab exemptions apply.  Furthermore, Defendants claim that even if the FLSA and NY labor laws were applicable, Plaintiff has failed to make a prima facie case that he was not properly paid, or that Defendants wrongfully converted his wages, warranting summary judgment.  Plaintiff opposes Defendants' motion.

---

[1]One additional consent to sue was filed in this case on January 19, 2013 on behalf of Martin Cocks. (Docket Entry ("DE") 43).  Plaintiff's motion to conditionally certify this as a collective action under FLSA § 216 (b) (DE37),  and Plaintiff's request for leave to move for Rule 23 class certification (DE 46), were denied without prejudice to renew following a determination of this motion.

[2]Plaintiff was granted leave to file an amended complaint, which he did on April 12, 2013 (DE 64).

BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 Statements, declarations, deposition testimony and other evidence submitted in support of the motion.  Defendant Delux and its family of companies named in this action collectively provide a variety of ground transportation services in the Port Washington area of Nassau County.  Defendants' Local Rule 56.1 Statement ("Def. 56.1 Stmt."), ¶ 2; Plaintiff's Counter-56.1 Statement ("Pl. Ctr-56.1 Stmt."), ¶ 2; Declaration of Peter Blasucci ("Blasucci Dec."), ¶ 1, 3, 5, 8.  Delux Franchise, Inc. is licensed as a "base owner" by the Town of North Hempstead, and subject to the Town of North Hempstead Code ("Town Code") governing the operation of taxicabs, limousines and private livery cars.  See Blasucci Dec., ¶ 11, Ex. A: Base Owner's License.

    1.    The Lease Agreement

On November 23, 2011, Plaintiff Arena signed a Taxicab Lease Agreement ("Lease Agreement" or "Agreement"), with Delux Transportation Services Inc.  This Agreement defined Delux as the "Lessor" and Arena as the "Lessee" of a taxicab, for which rent was to be paid by Lessee to the Lessor, to be used to transport passengers in accordance with the Town Code.  See Blasucci Dec., Ex., C: Taxicab Lease Agreement; Def. 56.1 Stmt., ¶ 3; Pl. Ctr-56.1 Stmt. ¶ 3.[3] The Lease Agreement further states that there "does not exist between them the relationship of employer-employee, principal-agent, or master-servant," and the relationship between the Lessor and Lessee is "strictly that of lessor-lessee, the LESSEE being free from interference or control on the part of the LESSOR in the operation of said taxicab."  See Blasucci Ex. C: Taxicab Lease

_____

[3]While Plaintiff refers to this as a "Sham Lease Agreement," he does not dispute that he signed it or what it says.  Pl. Ctr-56.1 Stmt., ¶ 3-4.

Agreement, at ¶ 5. The Agreement further provides that in addition to paying rent, the Lessee is responsible for a daily security deposit to ensure return of the taxicab in the same condition as accepted by the Lessee. Agreement, at ¶ 6. Under the Agreement, the "LESSOR disclaims any interest in the revenue received by LESSEE from passengers, and LESSEE shall be entitled to receive all such revenue for LESSEE's own account." Id., at ¶ 7. Attached to the Lease Agreement was "Schedule A" outlining daily lease rates, in eight and twelve hour shifts, with additional ½ hour to one hour lease increments available. Id., at ¶ 4; Blasucci Dec., Ex. D: Schedule A.

In June 2012, Arena informed Delux that he wanted to terminate the Lease Agreement, and turned in his charge machine and pager. See Blasucci Dec., at ¶ 34. A few weeks later, Arena returned to Delux, and executed another Lease Agreement, containing essentially the same terms as the Lease Agreement, and an additional term concerning the rental of the pager.[4] See Blasucci Dec., ¶ 35-37; Ex. E: Lease Agreement of July 2012. This arrangement lasted a few weeks, and Arena last leased a cab from Delux in August 2012. Blasucci Dec., ¶ 40.

2.      Driver Performance and Responsibilities

Prior to signing the Lease Agreement, Arena attended an orientation, for which he did not get paid. Declaration of Joseph Arena ("Arena Dec."), ¶ 5. At that time, he received a folder containing various documents about driving for Delux, including a Taxi Driver handbook, with zone maps, fare grids & common pick up locations, and various memoranda regarding sales tax

---

[4]The Court notes that Plaintiff filed this action on April 6, 2012, indicating that he had counsel prior to signing the Lease Agreement for the second time in July 2012. The Court also notes that before filing this action, Arena, through the same counsel, filed an action in this Court on March 3, 2012 against Plandome Taxi, Inc., Arena v. Plandome Taxi, Inc., et al, 12-CV-1078 (DRH)(WDW), also alleging violations of the FLSA and New York labor law.

information, expected standards on keeping the vehicles cleaned and maintained, standards on interacting with passengers, information on how to fill out forms, use radio terms and collect credit card payments, use of cell phones while driving, advice on handling various customer service situations and fare increases. Arena Dec., ¶ 5-10, Exs. 1-3, 6-9, 11-28, 30-33. He was also forced to watched a video during orientation regarding safe driving techniques, customer service and vehicle maintenance problems. Arena Dec., ¶ 8. After the orientation, he was taken on a tour of the Port Washington area, and was given a handwritten test. Arena Dec., ¶ 9-10. Arena then spent two days training, by riding in the car with another driver, learning, *inter alia*, how to fill out the forms, communicate with dispatch and use the credit card machine. Arena Dec., ¶ 12. During the second day of this training, Arena drove a veteran driver's car, picked up his passengers, and was evaluated on his performance. Arena was also not paid for the training days. Arena Dec., ¶ 12-15.

The Town of North Hempstead issued a taxi driver's license to Arena on November 14, 2011. See Blasucci Dec., ¶ 50, Ex. H: Arena's taxi driver's license. As noted above, on November 23, 2011, Plaintiff signed the Lease Agreement as required to begin driving for Delux. Arena Dec., ¶ 18-20.

i. Plaintiff's Schedule

Defendants assert that Plaintiff determined his own schedule of when he wanted to lease a cab. Def. 56.1 Stmt., ¶ 7. Plaintiff states that he would propose a schedule to be approved by management. Pl. Ctr-56.1 Stmt., ¶ 7; see also Declaration of Theodore J. Hecht ("Hecht Dec."), Ex. A: Deposition of Joseph Arena ("Arena Dep."), at 30 (Plaintiff and Delux "came up" with the days he would work). Plaintiff was told he had to work at least one weekend day. Arena

5

Dec., ¶ 25. Other than his testimony that he had to work one weekend day, there is no evidence that Plaintiff was obligated to lease a vehicle for any minimum amount of time.

If Plaintiff chose not to lease a cab on a particular day, there was no significant consequence. Arena testified that he "showed up to the best of [his] ability at the time," Arena Dep., at 31, and if he wasn't going to come in, he would have to call in. Id. There were times he called in, for example after traveling to play music when he would be too tired to drive the next day. Id., at 36-37. Plaintiff testified that while it was "frowned upon" to call in and not appear without prior notice, it was "okay" with Delux, and he was not subject to punishment or any other consequence from Delux. Id., at 37-38. See also Declaration of Kenneth Dennis ("Dennis Dec."), ¶ 3 (Arena's leasing patterns were inconsistent and he "came and went as he pleased.").[5]

Plaintiff states that he had to radio the dispatcher to take a break, and could not take a break for more than three minutes. Arena Dec., ¶ 39-42. He needed permission to return the car for the day, and could not finish a shift early without paying the lease for the entire day. Arena Dec., ¶ 39, 41.

ii. Vehicle Maintenance

Arena was required to keep the vehicle clean and check it at the beginning and end of a

---

[5]According to the Defendants, during the 40 week period that Arena drive a car for Delux, he leased a car on 57 days over that time period. See Def. 56.1 Stmt., ¶ 9; Loolam Dec., ¶ 7. Plaintiff disputes this, stating that he worked 6 days and 72 hours per week. Pl. Ctr-56.1 Stmt., ¶ 9. Yet, Plaintiff does not offer any evidence beyond his own testimony that he leased those additional days. See Arena Dep., at 44-45 ("I believe I leased the car for six days, to the best of my knowledge"); id., at 66-68 (Arena produced all the trip sheets he had and does not think he has others). This dispute of whether or not Plaintiff leased a cab for six days in a given week is not material to whether Plaintiff is an employee. More relevant is whether Plaintiff was obligated to lease a car for 6 days in a week. Arena doesn't point to anything in the record indicating any such obligation.

shift for a passenger's personal belongings and cleanliness, could not smoke or keep his personal belongings in the vehicle, or take it home or anywhere else without permission.  He also had to report any problems with the assigned vehicle, and bring it to a particular service station for repairs, if necessary.  Arena Dec. ¶ 27-38.  Arena was required to fill the vehicle with gas, Arena Dec., ¶ 30, 39, and Delux paid for any car wash.  Arena Dec., ¶ 36.  Delux assumed the cost of automobile insurance.  Blasucci Dec., ¶ 29.

Each car, a sedan with a maximum capacity of 5 persons, including the driver, was labeled with a "Delux Transportation Service" sign and phone numbers on the driver's side, and a "taxi" sign on top of the car.  See Blasucci Dec., ¶ 50-51, Ex. I: photos of vehicles.  There was no fare meter, plastic wall or shield between the passenger and driver, credit card machine for the passenger, posted rate schedules, driver identification information or a method to indicate the driver is off-duty in the vehicles.  Arena Dec., ¶ 46.

### iii.  Dispatched Calls

According to Delux, its dispatcher would inform drivers of a passenger request for pick up, and send the information concerning the pick up and drop-off locations to the driver by two-way radio.  Dennis Dec., ¶ 2, 6.  As requests for passenger service came is, the calls were dispatched.  Id., ¶ 21.  The dispatch office would not get involved in calls that went directly to the driver.  Id., ¶ 2.  No driver was required to take a dispatched call.  Id., ¶ 4, 19.  According to Delux, its dispatcher did not fix routes, or direct a driver to follow a specific route.  Id., ¶ 20.  The dispatcher would try to group 2 or 3 passengers going in the same direction with the same driver, but the driver is not required to take all of the passengers.  Id., ¶ 22.  The Town Code requires that the driver take passengers in the most direct route.  Id.

Delux claims that Arena was under no obligation to take dispatched calls, and that indeed Arena "frequently" refused dispatched calls, refusing "at least one call per day and often more." Id., ¶ 5.  Arena "repeatedly" refused calls for passengers that required extra assistance, such as the elderly or disabled.  Id., ¶ 4-7.  According to Delux's dispatcher, while drivers typically took all dispatched calls since drivers took 100% of the proceeds of the call, Arena did not.  Id., ¶ 4. Arena would not take calls, might take breaks or otherwise be unavailable at his own discretion, or leave the lease before the end of a shift if business was slow, decline passengers heading in the same direction as the fare he did take, and often made himself unavailable during the busy weekend and holiday hours.  Id., ¶ 5-18.

Arena claims that Defendants "controlled which passengers [he] could take," and he could only take those passengers cleared through the dispatcher.  Arena Dec., ¶ 43-45.  Plaintiff was not permitted to pick up passengers that "hail," nor could he cruise for passengers, or change a passenger's destination without approval from dispatch.  Id., ¶ 47, 51-54.  Arena "did not feel" he was allowed to turn down calls.  Id., ¶ 49.  He was required to obtain permission from dispatch before driving a particular route.  Id., ¶ 53.  At the train station, he had to wait on the driver line prior to picking up a passenger.  Id., ¶ 56.  In his deposition, Arena testified that he didn't remember if he ever refused a call from dispatch, Arena Dep., at 78, but recalled that he did not like taking calls involving elderly passengers.  Id., at 83-84.  Plaintiff could not give out his private cell number to take direct calls from potential passengers.  Arena Dec., ¶ 45.

iv.  Fares

The cars driven by Arena did not contain a fare counter meter.  Arena Dec., ¶ 46. Dispatch would arrange the pick ups and inform Arena and all drivers of the details, including

8

the fare to charge. Id., ¶ 43-44. According to the Town of North Hempstead Code, each taxicab owner was required to file a schedule of rates with the Town Clerk, and it could not charge a rate exceeding the fare on file. Blasucci Dec., Ex. B: Town Code, § 52-39. The Town Code also prohibits a taxi cab driver from cruising for passengers or charging a fare larger than proscribed. Id., § 52-38; Blasucci Dec., ¶ 48 (the Town Code dictates that Delux charge a lawful fare and schedules of lawful rates and zones are provided to the drivers).

The Town Code, § 52-38(P), mandates that every dispatcher or taxi cab driver keep a written record of a driver's daily trips dispatched by Delux. Blasucci Dec., ¶ 55; Ex. J: Driver Open Jobs. Delux' Driver Open Jobs records reflect each pick up and drop off location, time and fare collected by Arena. Id., Ex. J. They do not reflect passengers Arena took either from the train station or when contacted directly. Id., ¶ 57. The Town Code required that those records be maintained by Plaintiff. Id.

3.      Driver Compensation

As stated above, the Lease Agreement provided that the fare collected from passengers was entirely recouped by each driver. See Blasucci Dec., Ex. C & E: Lease Agreement, ¶ 7. If a passenger chose to pay by credit card or through a charge account, Delux processed the fare and paid it to the driver. In those instances, those fares were recorded by Delux and were offset against the amount owed to Delux for the leasing of the car. Sometimes this resulted in a credit to the driver, or other times a credit to Delux, depending on the amount of rent owed Delux and fares to be transferred to the driver. See Declaration of Valerie Loolam ("Loolam Dec."), ¶ 2-4; Arena Dep., at 19-20; see Arena Dep., at 21 ("I kept cash that was mine after my lease could be paid, that's how I got paid."). Neither Delux nor any other Defendant issued Arena a pay stub,

9

W-2 or a 1099 form. Arena Dec., ¶ 59; Blasucci Dec., ¶ 22.

At the end of each driver's shift, he or she would complete and submit a reconciliation report ("Reconciliation Report") that reflected the time the shift started, the lease amount, and related sales tax, security deposit installment and the fares charged by credit card during that shift. See Loolam Dec., ¶ 2-3, Ex. A: Arena's Reconciliation Reports. Each Reconciliation Report would reflect whether the credit card charges were sufficient to cover the rental fee and taxes, in which case Delux owed Arena money, or if the credit card charges were insufficient to cover those amounts due Delux, in which case Arena owed Delux money. Id., ¶ 4-5; Ex. A. From the Reconciliation Report, Delux would prepare a lease statement for each driver that reflected the lease amount due and the charged fares, and whether Delux was owed money or the driver was owed money. Id., at ¶ 5, Ex. B: Arena's lease statements.

The Reconciliation Reports do not reflect any cash collected by Arena – either for fares or for tips. Id., ¶ 4; cf. Arena Dec., ¶ 58 (only house account and charged rides were recorded). Arena retained all cash fares and tips himself and they were not reported to Delux. See Arena Dep., at 21 ("I kept cash that was mine after my lease could be paid, that's how I got paid."); id., at 22 ("Tips were not reported to Delux."); id., at 25 (trip sheets do not show the cash paid by passengers).

Plaintiff does not indicate the total amount of money earned while driving cars for Delux.[6] As noted above, the Reconciliation Reports reflect the credit card charges, but not cash

---

[6]Arena drove cars for Delux from November 2011 until June 2012, and then again for a short period from July - August 2012. Def. 56.1 Stmt., ¶ 17; Pl. Ctr-56.1 Stmt., ¶ 17. Arena's tax return of 2011 shows income of $757 and an occupation of "sales." Hecht Dec., Ex. B: Arena's 2011 U.S. Income Tax Return. Arena's tax return for 2012 was not submitted to the Court.

receipts.  Plaintiff's amended complaint alleges that he earned "$150.00 per week in cash after splitting the fares with Defendants" and that he was not compensated for overtime or hours worked in excess of ten hours per day.  See Amended Complaint, ¶ 57.  As described above, Defendants do not have record of any cash Plaintiff collected directly from passengers.  See Loolam Dec., ¶ 4; Arena Dep., at 22-23 (Arena did not report cash tips to Delux); Id., at 25 (trip sheets don't show the amount of cash collected from passengers).  It is unclear if Plaintiff has evidence of all of the cash he collected.  See Arena Dep., at 61 (Plaintiff doesn't recall recording the amount of cash he collected); id., at 149 (Plaintiff does not have a record of the amount of tips he earned).[7]  Plaintiff's declaration does not state how much money he collected in total during the period of time he drove for Delux.[8]

## DISCUSSION

I.   Standards on Motion for Summary Judgment

The standards for summary judgment are well settled.  Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); Mihalik v. Credit Agricole Cheuvreux North America, Inc.,

---

[7]The Court notes that since it was Plaintiff and not Defendants that collected the fares received in cash, this case is distinguishable from a typical FLSA case where the employer is required to maintain records of the hours worked and compensation paid to its employees.

[8]In opposition to this motion, Plaintiff's counsel has submitted a declaration and exhibit that counsel created, that calculates the wages paid to Plaintiff during a six-week period to determine Plaintiff's average rate of pay.  See Declaration of Bryan Arbett ("Arbett Dec."), Ex. 100.  According to the declaration, the data underlying this calculation was taken from the Defendants' records.  Id., at ¶ 2.  As stated above, and as noted by Defendants (see Defendants' Reply Memorandum of Law, at 9-10), these calculations therefore do not include all of the cash receipts retained by Plaintiff.

2013 WL 1776643 (2d Cir. 2013). The moving party bears the burden of showing entitlement to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005). In the context of a Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004).

    Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002), quoting, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As the Supreme Court has stated, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984), quoting, SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996), quoting, Research Automation Corp., 585 F.2d at 33.

    "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial. ... There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. ... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 248-250 (citations omitted). "For the purposes of summary judgment, however, we assume that these factual disputes will be resolved in favor of [plaintiff]." Velez v. Sanchez, 693 F.3d 308, 315 (2d Cir. 2012).

II.      Whether Plaintiff is an Employee

     A.  Under the FLSA

     1.  Legal Standards

Plaintiff's claims under the FLSA depend on whether the Plaintiff is an employee of Delux.  The FLSA defines "employee" as "any individual employed by an employer," and to "employ" as including "to suffer or permit work."  29 U.S.C. §§ 203(e)(1), 203(g) (1982 & Supp. III 1985).  The definition is broad, and several factors, known as the "economic reality test," are relevant to determining whether an individual is an "employee."

The Supreme Court has instructed that the test should be a flexible one, "grounded in 'economic reality rather than technical concepts,'... determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'" Barfield v. N.Y.C. Health & Hospitals Corp., 537 F.3d 132, 141 (2d Cir. 2008), quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) and Rutherford Food Corp. v. McComb, 331 U.S. 722, 729-730, 67 S.Ct. 1473 (1947) (internal quotation marks omitted).  The Second Circuit has treated employment under the FLSA as something to be determined on an case by case review of the totality of the circumstances.  As such, "economic reality" is assessed

13

by different relevant factors, depending on the particular case. Barfield, at 141-142.

The Second Circuit has applied slightly different factors in different types of cases. For example, in a case evaluating whether prison inmates in a college-managed program were employed by the college, the factors were: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. See Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984) (citations omitted).

In another case involving whether a nurse was an employee or independent contractor of a health case agency, the factors applied, derived from United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) were (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business. The review is based on the "totality of the circumstances." See Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-1059 (2d Cir. 1988) (citations omitted). See also Barfield v. N.Y.C. Health & Hospitals Corp., 537 F.3d 132, 142–43 (2d Cir. 2008) (citing Brock, 840 F.2d at 1058–1059); see also Velez v. Sanchez, 693 F.3d 308, 327 (2d Cir. 2012) (stating that the Brock test is "relevant for distinguishing between independent contractors and employees"); Spiteri v. Russo, 2013 WL 4806960, *57 (E.D.N.Y. 2013).

Finally, in a case evaluating the joint employment of garment workers hired as

14

subcontractors by garment manufacturers, <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61 (2d Cir.

2003), the Second Circuit focused in the functional control of the putative joint employer, and

applied the following six factors:  (1) whether the defendant's premises and equipment were used

for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as

a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a

discrete line-job that was integral to defendant's process of production; (4) whether responsibility

under the contracts could pass from one subcontractor to another without material changes; (5)

the degree to which the defendant contractor or its agents supervised plaintiffs' work; and (6)

whether plaintiffs worked exclusively or predominantly for the defendant.  See <u>Zheng</u>, 355 F.3d

at 72.

      Thus, the Second Circuit states no rigid rule for determining an employee under the

FLSA, but uses various factors (1) to examine the degree of formal control exercised over a

worker, (<u>see</u> <u>Carter v. Dutchess Cmty. Coll.</u>, 735 F.2d at 12); (2) to distinguish between

independent contractors and employees, (<u>see</u> <u>Brock v. Superior Care, Inc.</u>, 840 F.2d at 1058–59);

and (3) to assess whether an entity that lacked formal control nevertheless exercised functional

control over a worker, (<u>see</u> <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d at 72).  See <u>Barfield</u>, 537

F.3d at 143.  As noted in <u>Zheng</u>, these "provide a 'nonexclusive and overlapping set of factors' to

ensure that the economic realities test mandated by the Supreme Court  is sufficiently

comprehensive and flexible to give proper effect to the broad language of the FLSA."  <u>Barfield</u>,

537 F.3d at 143, quoting <u>Zheng</u>, at 75-76.  See also <u>Velu v. Velocity Express Inc.</u>, 666 F.Supp.2d

300, 305-306 (E.D.N.Y. 2009)(reviewing the different sets of factors used to determine the

"economic reality" of whether an employment relationship exists).  Moreover, a district court is

"free to consider any other factors it deems relevant to its assessment of the economic realities."
D'Arpa v. Runway Towing Corp., 2013 WL 3010810, *12 (E.D.N.Y. 2013), quoting Zheng, 355
F.3d at 71–72.

    2. Application to this Case

The Court finds that the Brock factors are most helpful to determining the "economic
reality" of whether an employment relationship exists here. These factors are: (1) the degree of
control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss
and their investment in the business, (3) the degree of skill and independent initiative required to
perform the work, (4) the permanence or duration of the working relationship, and (5) the extent
to which the work is an integral part of the employer's business. Brock v. Superior Care, Inc.,
840 F.2d 1054, 1058-1059 (2d Cir. 1988).

    a. The degree of control exercised by the employer

Concerning the degree of control by the putative employer, the Court finds it very
persuasive that Defendants had little control over when Plaintiff drove, how much he drive, or
how frequently. Defendants state that Plaintiff set his own schedule, which Plaintiff admits,
although he asserts his proposed schedule needed management approval and that he had to chose
between morning or evening shifts. The record further indicates it was Plaintiff's option to lease
a vehicle for either 8 or 12 hour shifts, with a possible extension for an additional ½ hour or 1
hour. See Blassuci Dec., Ex. D: Schedule A.

Importantly, there is no dispute that Plaintiff could cancel his scheduled days to work at
his choosing, and other than it being "frowned upon," there was no real consequence. Indeed,
Plaintiff did "call in" on various occasions to permit him the opportunity to pursue a musical

16

career and testified that this was "okay" with Delux. Presumably in those instances, other drivers filled the void created by Plaintiff's absence, without any repercussion to Plaintiff, other than a missed opportunity to earn money. Indeed, nothing in the records indicates that Plaintiff was ever fired or reprimanded for not appearing to drive on a scheduled day.

There is also no evidence in the record to indicate that Delux exhibited any significant management or supervision over Plaintiff on a regular or ongoing basis. Plaintiff claims that Delux exhibited control over him when it mandated that he attend the orientation and training, dictated customer service policies and behaviors, and required that he complete forms a particular way and follow a dress code of black pants with a white collared sheet. Plaintiff also asserts that he was supervised "to ensure [that Arena] provided safe driving and transportation to the customers." See Plaintiff's Memorandum of Law in Opposition ("Pl. Mem."), at 8. Finally, Plaintiff argues Delux controlled him by requiring he keep his vehicle clean and free of personal items, and seek permission to take breaks.

The Court finds that these factors do not rise to the level of control necessary to impute an employment relationship. It is apparent that Plaintiff set his own schedule, and adhered to it at his discretion without any consequence from Defendants. There is no indication that Plaintiff was required to drive a minimum number of days or hours over a particular period of time. While he was given guidelines on how to interact with customers, fill out forms, and even dress, there is no evidence that he was managed or supervised on a regular or ongoing basis, or that he or any other driver was penalized for not adhering to any of these guidelines. See Herman v. Express Sixty-Minutes Delivery Service, Inc., 161 F.3d 299, 303 (5th Cir. 1998) (required attendance at training and orientation do not outweigh other factors indicating lack of control).

17

While Plaintiff claims he "did not feel" he could turn down a dispatched call, or had to drive a particular route,[9] again there is no evidence that he was ever penalized by Delux for not complying. See Browning v. CEVA Freight, LLC, 885 F.Supp.2d 590, (E.D.N.Y. 2012) (plaintiffs' fear of repercussions if they turned down driving assignments is not evidence of an actual penalty). Indeed, since it is undisputed that all the fares generated were his to keep, it seems the only real consequence for declining a dispatched call was the loss of the fare to him. This does not indicate Defendants' control over Plaintiff.

      b. The opportunity for profit or loss

It is undisputed that Defendants did not pay Plaintiff any compensation, and Plaintiff never received a pay stub, W-2 or 1099. There is also no dispute that Plaintiff received all revenues generated by the fares that Plaintiff picked up. Thus, if Plaintiff had more fares in a given day, it follows that Plaintiff earned more money. Plaintiff paid a pre-established rate for the daily lease of the vehicle that was not connected in any way to the fares collected by the driver. Therefore, even considering Plaintiff's claim that his compensation was diminished because of the amount he paid for the daily lease, Plaintiff controlled on how much overall money he earned as a result of the number of calls he took and fares he earned. See Yellow Taxi Co. of Minneapolis v. N.L.R.B., 721 F.2d 366 (D.C. Cir. 1983) (in evaluating employment under the National Labor Relations Act, "[w]hen a driver pays a fixed rental, regardless of his earnings on a particular day, and when he retains all the fares he collects without having to account to the company in any way, there is a strong inference that the cab company involved does not exert

---

[9]The Town Code requires that a taxicab driver follow the most direct route. Dennis Dec., ¶ 22.

control over 'the means and manner' of his performance.")(quoting <u>Local 777, Democratic</u> <u>Union Organizing Committee, Seafarers Intern. Union of North America, AFL-CIO v. N. L. R.</u> <u>B.</u>, 603 F.2d 862, 879 (D.C. Cir. 1978)); <u>see</u> <u>also</u> <u>NLRB v. Associated Diamond Cabs</u>, 702 F.2d 912, 924 (11th Cir. 1983) (that the company's profits are derived solely from the lease paid by the lessee and not the profits earned by the driver, favors independent contractor status) (citations omitted).

Plaintiff further argues that Defendants dictated the fare he charged and thus the amount he earned, but the record reflects that while the dispatcher informed the Plaintiff of the fare to charge, the Town Code controlled the amount of the fare, not the Defendants. <u>See</u> Blasucci Dec., Ex. B: Town Code, § 52-38.

### c. The degree of skill and independent initiative required to perform the work

In order for Plaintiff to drive for Delux, he had to know how to drive and he had to be licensed by the Town of North Hempstead. He indeed was, just prior to signing the Lease Agreement, and as a licensed driver, Arena had to know of and follow the Town Code guidelines covering taxi cab drivers. <u>See</u> Blasucci Dec., Ex. H: Arena's Taxi Driver's License. He also had to navigate his routes and maintain the safety of his passengers, and had to have initiative to accept dispatched calls and transport his passengers in an efficient manner. This constitutes a skill set sufficient to favor against employee status. <u>See</u> <u>Leach v. Kaykov</u>, 2011 WL 1240022, *19 (E.D.N.Y. 2011) (in applying New Jersey law, that plaintiff maintained his own and a taxicab driver's licenses, operated his motor vehicle, and navigated between points of pick-up and delivery, was characteristic of an independent contractor).

### d. The permanence or duration of the working relationship

The working relationship between Plaintiff and Delux was governed by the Lease Agreement. It does not specify the length of its term, but provides that any security deposit would be returned within ninety (90) days of termination. See Blasucci Dec., Ex. C & E: Lease Agreements. In any event, no matter what the Agreement states, it is undisputed that here Plaintiff drove for Defendants for a period of approximately seven months from November 2011 through June 2012, when the Agreement was terminated. Soon thereafter, Plaintiff returned to Delux and another Agreement was signed, which lasted for a couple of weeks, from July to August 2012. Thus, it is clear from the manner in which these parties acted in this case that the arrangement is temporary in nature and could be created and terminated easily. See also Browning, 885 F.Supp.2d at 610 (that parties' contractual obligation was terminable by either party at any time does not suggest a permanent relationship)(citations omitted). Furthermore, that Plaintiff had the discretion to set his own schedule and abide by it in his discretion without consequence is indicative of a temporary working relationship. This favors against employment.

   e. The extent to which the work is an integral part of the employer's business

It is apparent from the record that when Plaintiff did not show up to drive, or did not take a dispatched call, other drivers stepped in to take those fares and transport those passengers. See Velu v. Velocity Express, Inc., 666 F.Supp.2d 300, 307 (E.D.N.Y. 2009)(while plaintiff's work is integral to defendants' business, "his work is interchangeable with other drivers; when he refuses work, other drivers fill in."); Browning, 885 F.Supp.2d at 610 (noting that while plaintiff drivers were integral to business, they were easily replaceable, and thus only "weighs slightly" in favor of finding employment).

Reviewing all of these factors together and in a light most favorable to the Plaintiff, the

20

Court finds the totality of the circumstances indicate that the economic reality is that there is no

employer-employee relationship here.  The Court also finds it relevant that Plaintiff's 2011 tax

return, shows an income of $757 and his occupation as "sales," which is contrary to his now-

stated claim of employment as a driver.  Also relevant, while not dispositive, is that the Lease

Agreement, which Plaintiff acknowledges he signed, specifically denies an employer-employee

relationship.  The Court finds that Plaintiff's claims under the FLSA fail, and Defendants'

motion for summary judgment on those claims is granted.[10]

    B.  Under New York Law

    The standard for determining whether someone is an employee under New York law is

slightly different than that used for an FLSA claim.  Under the NYLL, the "critical inquiry in

determining whether an employment relationship exists pertains to the degree of control

exercised by the purported employer over the results produced or the means used to achieve the

results."  Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198, 802 N.E.2d 1090, 1092-1093, 770

N.Y.S.2d 692, 694-695 (2003) (citations omitted).  The relevant factors include "whether the

worker (1) worked at his own convenience, (2) was free to engage in other employment, (3)

received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule."  Id.

The inquiry focuses on the degree of control, rather than "economic reality" of the situation

evaluated for an FLSA claim.  See Hart v. Rick's Cabaret Intern., Inc., 2013 WL 4822199, *16

---

[10] In light of the Court's finding that Plaintiff is not an employee and the FLSA does not
apply, there is no need to address the affirmative defense of whether the taxicab exemption of the
FLSA applies.  See DeJesus v. HF Management Services, LLC, 726 F.3d 85, 91, n. 7 (2d Cir.
2013) (an exemption is an affirmative defense, with the burden of proof on defendants), citing
Corning Glass Works v. Brennan, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Martin
v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991).

(S.D.N.Y 2013), quoting <u>Velu v. Velocity Express, Inc.,</u> 666 F.Supp.2d 300, 307 (E.D.N.Y. 2009).

As discussed above, Plaintiff here drove at his convenience. He proposed his own schedule, albeit approved by management. He was able to and did indeed "call in" on occasion to take himself off the schedule, without penalty. The requirement that he call in, which presumably permits the Defendants to prepare for Plaintiff's absence, does not create control indicative of an employment relationship. <u>See</u> <u>Browning</u>, 885 F.Supp.2d at 602 (requiring advance notice of delivery driver's absence does not weigh in favor of finding employment), citing <u>Claim of Pavan</u>, 173 A.D.2d 1036, 570 N.Y.S.2d 696 (3rd Dep't. 1991).

Plaintiff was also free to engage in other employment. In fact, plaintiff testified that on ocassion he called in and took himself off the schedule to drive for Defendants in favor of spending time to pursue a music career. Plaintiff did not receive any fringe benefits from Defendants, and it is also undisputed that Plaintiff never received a pay stub, W-2 or 1099, and was not on Defendants's payroll. Finally, as discussed above, Plaintiff was not a fixed schedule. Thus, the Court finds that Plaintiff is not an employee under New York labor law, and therefore Defendants' motion for summary judgment on those claims is also granted.

III.     <u>Plaintiff's Remaining State Law Claims</u>

In light of the above dismissal of Plaintiff's claims under the FLSA and New York labor law, the Court declines jurisdiction over Plaintiff's remaining state law claims, which are hereby dismissed without prejudice.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted in its

entirety and Plaintiff's amended complaint is dismissed as to all causes of action.  The Clerk of

the Court is hereby directed to close this case.

SO ORDERED.

s/ Leonard D. Wexler

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       February 26, 2014

23